GIBNEY v. ST. LOUIS TRANSIT COMPANY,
Appellant.

Division Two, June 11, 1907.

1. **CHANGE OF VENUE: No Exception.** Unless appellant saved an exception at the time the court granted a change of venue, the action of the court in awarding the change cannot be considered on appeal. It is likewise necessary that the motion for a new trial contain an assignment of error in this regard.

2. **JUROR: Prejudice: Strike.** The juror on his *voir dire* examination testified that he had no relations of business or interests with defendant railroad company, and that he had no prejudice or bias against the parties or either of them. After the trial it was shown that he was the leader of a strike three years previously by defendant's employees against defendant, which lasted several weeks, and that during the strike bitter feeling existed between the employees and the defendant, and that defendant's tracks were demolished by dynamite, and crimes, some of them felonies, were committed by the strikers. On being confronted by these facts, the juror testified again that he did not have any prejudice either way in the case. There had been a change in the management of defendant company since the strike, and the trial was had and the juror resided in another county. *Held*, first, that the juror was prejudiced, and if he had revealed the facts in regard to the trial it is not reasonable to suppose he would have been retained as a juror; *second*, it cannot be assumed that a person who has become prejudiced against another, ceased to bear malice against him at any particular time, and a certain state of facts once known to exist is presumed to continue until the contrary is shown, and the contrary is not shown by the juror's testimony alone; *third*, the juror's prejudice was emphasized by by the exceedingly large and unjustifiable verdict; and *fourth*, the court should have granted a new trial on account of the juror's prejudice, brought to the court's attention in the motion therefor.

3. **NURSES: Members of Family: No Express Contract.** For services rendered plaintiff by her daughters of legal age. while they were members of her family, plaintiff cannot recover in her suit against the railroad company for damages for her negligent injury, unless the services were rendered under an express contract of employment. Unless there was such an express contract the services rendered by the daughters while members of her family, whether usual or extraordinary, or whether they were under or over legal age, are presumed in law to have been gratuitous, for which the mother was not legally liable, and in consequence the defendant who negligently inflicted the injuries on the mother out of which the services grew is not liable.

4. **EXCESSIVE VERDICT: $30,000: New Trial.** The verdict for thirty thousand dollars in this case is so manifestly excessive, and their probable effect it is *held* that the ends of justice will be facts in relation to plaintiff's injuries, their nature and extent and thei rprobable effect on her health in the future, and the expenses incurred, that it is *held* that the ends of justice will be best subserved by a new trial.

Appeal from Montgomery Circuit Court.—*Hon. E. M. Hughes*, Judge.

REVERSED AND REMANDED.

*Boyle & Priest* and *Edward T. Miller* for appellant.

(1) The circuit court of St. Louis city improperly considered and granted plaintiff's application for a change of venue. (a) The application was presented too late, the trial having begun. Fugate v. Carter, 6 Mo. 267.; Junior v. Power Co., 127 Mo. 79; State v. Lehman, 182 Mo. 424. (b) No notice was given to defendant of the application. Sec. 822, R. S. 1899; Railroad v. Holliday, 131 Mo. 440; State v. Lehman, 182 Mo. 424. (c) The affidavit for the change of venue does not state that affiant believed that plaintiff could not have a fair trial in the circuit court of the city of St. Louis. Sec. 821, R. S. 1899; Railroad v. Powell, 104 Mo. App. 362. (2) A new trial should have been

granted because the juror Samuel A. Moore was not qualified to sit as a juror as shown by the affidavits in support of the motion for a new trial. The juror testifying at the hearing of the motion did not controvert the principal facts contained in the affidavits. Those facts conclusively established the juror's unfitness to serve. Theobald v. Railroad, 191 Mo. 395; Pool v. Railroad, 6 Fed. 844; Essex v. McPherson, 64 Ill. 349; Johnson v. Tyler (Ind.), 27 N. E. 643; Pearcy v. Ins. Co., 111 Ind. 59; Tenney v. Evans, 13 N. H. 462; Heasley v. Nichols, 80 Pac. 769. (3) The court erred in giving plaintiff's instruction 5 with reference to the measure of damages. The third element therein submitted is erroneous for the following reasons: (a) Plaintiff was not entitled to recover for "expenses necessarily incurred for nursing" because it is undisputed that the only services of this character were rendered by her daughters, members of her family, and no express agreement to pay for those services was shown. Erhardt v. Dietrich, 118 Mo. 418; Kostuba v. Miller, 137 Mo. 161; Goodhardt v. Railroad, 177 Pa. St. 191; Voorhies on Damages, p. 29, sec. 18. (b) It was not claimed that plaintiff's daughters were trained nurses, yet the only testimony as to the value of a nurse's services relates to the services of a trained nurse. There was, therefore, no testimony upon which to base the element of damage predicated of "expenses necessarily incurred for nursing." MacDonald v. Railroad, 108 Mo. App. 374. (c) The petition alleged expenses incurred. The instruction permitted a recovery for expenses incurred. There was no evidence that plaintiff had incurred any expenses for nursing. If none were incurred plaintiff cannot say under the pleadings that defendant cannot avail itself of the generosity, charity or indulgence extended to plaintiff by a third party. Morris v. Railroad, 144 Mo. 500. (d) Plaintiff was nursed by her daughters, the number of whom

is not stated. There were at least three, as her daughter Marguerite testified that "my sisters and I nursed her." If the jury so desired it could under this instruction allow at least $18 a day for nursing, and a greater amount if they surmised that plaintiff had more than three daughters. This element of uncertainty destroys the value of the testimony as a basis of recovery. Duke v. Railroad, 99 Mo. 347. (4) The verdict is grossly excessive and unmistakably evidences the passion and prejudice of the jury against defendant. No portion of such verdict should be permitted to stand. Norris v. Whyte, 158 Mo. 20; Smoot v. Kansas City, 194 Mo. 513; Ice Co. v. Tamm, 90 Mo. App. 189.

*A. R. Taylor* for respondent.

(1) There can be no contention, and there is no contention, that under the evidence in this case, the jury were not justified in returning a verdict for plaintiff. (2) The statute in force when the application for change of venue was made is sections 821, 822, Revised Statutes 1899. This statute went into effect in 1895. As a conclusion of the section providing the mode of claimed that plaintiff's daughters were trained nurvided, however, this act shall not apply to causes wherein a special venire shall have been issued, and in such case the party not applying for such special venire shall be granted a change of venue, as of course upon proper affidavit." We doubt if counsel for appellant had in mind this statute when citing the cases of Fugate v. Carter, 6 Mo. 267; Junior v. Electric Light Co., 127 Mo. 80; Railroad v. Holladay, 131 Mo. 451. All of these cases were ruled upon a different statute, and long before the present statute was enacted, and could have no possible relevancy here where the statute is radically different. (3) The trial court should not have granted a new trial on the ground that juror

Moore was one of the twelve who tried the case. The affidavits and evidence on this issue were heard by the trial judge in passing on this question, and after weighing the evidence the trial court held he was qualified, and was right in so holding. (4) The next contention of appellant is that plaintiff was not entitled to recover for the nursing she received from her daughters, though they were of age and in law under no obligation to serve their mother without reward. Appellant's authorities cited on this point, we think, and submit, do not fit the facts of this case, with the exception of Morris v. Railroad, 144 Mo., which as we think was finally decided rather on a question of pleading than on the merits. Here, upon appellant's contention, this service must be presumed by the court to have been rendered by these daughters not for the mother, but for the defendant tortfeasor. For these daughters are and must be presumed to have known the law and that the law required the tortfeasor to compensate the injured plaintiff for every expense reasonably necessary for the relief of her from the injuries wrongfully inflicted. We respectfully ask the court if it can presume that these young women intended that their service to their mother to relieve her distress was a donation to the tortfeasor? Does it not require an entire departure from what the court knows is human nature, to presume such a gift? Such a presumption can only arise when human nature reaches the perfection of humility taught in Galilee. If the enemy smite thee on one cheek turn the other cheek to receive a like blow. Return good for evil. Such is not human law as administered and recognized by the courts in adjusting human rights. 1 Sutherland on Damages (3 Ed.), sec. 7; 1 Joyce on Damages, sec. 256; Murray v. Railroad, 101 Mo. 236; Bronson v. Sweetser, 127 Ind. 8.

BURGESS, J.—This is an action for damages for personal injuries alleged to have been sustained by plaintiff on the 13th day of June, 1902, by being thrown from defendant's car, by reason of its premature start, whilst plaintiff was in the act of alighting therefrom at the corner of Taylor and Washington avenues in the city of St. Louis. The action was instituted in the circuit court of the city of St. Louis, and afterwards, on the 18th day of April, 1903, on application of plaintiff for a change of venue, the cause was transferred to the circuit court of Montgomery county, where plaintiff, upon trial had, recovered a verdict and judgment for the sum of thirty thousand dollars. Defendant filed motion for new trial, and afterwards, and within four days after the rendition of the verdict, filed a supplemental motion for a new trial, also motion in arrest of judgment, which motions were by the court overruled, and defendant appealed.

The petition is in the usual form of an action by an injured passenger against a carrier, and charged in substance that the defendant at the times alleged was a corporation by virtue of the law of Missouri and used and operated the railway and car mentioned for the purpose of carrying passengers for hire from one point to another in the city of St. Louis as a street railway company. "That on the 13th day of June, 1902, the defendant, by its servants in charge of its car, received the plaintiff as a passenger thereon, and for a valuable consideration by the plaintiff paid to the defendant, undertook and agreed with the plaintiff to carry her safely as a passenger on said car to her point of destination on defendant's line, and to then stop said car, to-wit, at Washington Boulevard (or avenue) and Taylor avenue, in the city of St. Louis, and allow plaintiff a reasonable time and opportunity to alight in safety; avers that the defendant, unmindful of its undertaking and of its duty in the premises, did, by its servants in

charge of said car, whilst it was stopped at the plaintiff's said point of destination to enable passengers, including the plaintiff, to alight from said car and whilst the plaintiff was in the act of alighting from said car, and before she had a reasonable time or opportunity to do so, negligently cause and suffer said car to be started in motion, whereby the plaintiff was thrown and caused to fall from said car to the street, and to be thereby permanently injured upon the spine, chest and body, and also to sustain a great and permanent injury to the nervous system and also to be injured internally.''

The petition then sets up an ordinance of the city of St. Louis prohibiting conductors from allowing women to enter or leave cars whilst in motion and in disregard of this ordinance, and claimed that such violation of this ordinance contributed to cause plaintiff's injuries, and alleges her injuries as follows: ''That by her injuries, caused as aforesaid, the plaintiff has suffered and will suffer great pain of body and mind; has been permanently crippled; has been permanently disabled from carrying on her business as a keeper of boarders, and carrying on business as a saleswoman and other business, and has been permanently disabled from labor; has been made an invalid for life; has incurred and will incur large expenses for medicines, medical and surgical attention and nursing, to her damage in the sum of fifty thousand dollars, for which sum she prays judgment.''

The answer was a general denial and a plea of contributory negligence on the part of the plaintiff in alighting from a moving car at a time and place when and where the same had not been stopped for the purpose of permitting passengers to alight therefrom.

The reply was a general denial.

Upon almost every salient fact in evidence in this

case the testimony on behalf of the opposing parties is in direct conflict.

Plaintiff's evidence tended to prove that she was fifty-two years of age, had lived in St. Louis about twelve years, and that her health had been perfect prior to the accident. She was connected with a medical firm, and traveled, lectured, and sold a certain proprietary medicine, called Granagophone, for women only. Her earnings from this employment averaged thirty or forty dollars per week. She also kept boarders, but there is no evidence as to the earnings or profits she derived from such business.

At about eight o'clock on the evening of June 13th, 1902, at Spring and Olive streets in the city of St. Louis, plaintiff, accompanied by her daughter Marguerite, boarded one of defendant's cars, whose course was west on Olive street, and north on Taylor avenue. The car had seats running crosswise from side to side, and a step or running board along the side of the car from end to end, for the use of passengers in boarding the car or alighting therefrom. At the end of each seat was an upright standard in which was an electric button by means of which passengers indicated to the conductor their desire to have the car stopped. Plaintiff boarded the car at the right side and sat at the end of the third or fourth seat from the front, being thus close to the running board and on the east side of the car as it was going north on Taylor avenue. Just before reaching Washington Boulevard she rang the bell twice for the car to stop, whereupon her daughter asked her why she rang it the second time, and she replied, "The conductor is doubly warned that we want to get off." When the car stopped she got up from the seat, stepped on the running board preparatory to alighting, and while in that position the car started, throwing her to the street and into the gutter by the pavement. Plaintiff's description of the accident was

substantially corroborated by the testimony of her daughter, Marguerite, who sat beside her on the car, and also by the testimony of witnesses Finnegan and Stone, passengers thereon. It further appears from their testimony that plaintiff fell about two feet from the curbing on the east side of the street, and remained there until she received assistance; that five or six passengers alighted from the car at that point, whilst plaintiff was leaving the car, two of which passengers were women; that while plaintiff was standing on the running board the signal for starting the car was given, and that the signal to stop was given just after she fell, but that the car ran about a hundred feet before it came to a standstill; that at the time plaintiff was standing on the running board she was facing north, the direction in which the car was going. Plaintiff was assisted to her home by her daughter and a Mr. Bartley, and she was immediately put in bed by her daughters. Her left hip was bruised and very sore for a good while, and then trouble to her spine ensued. Dr. Brokaw, the defendant's surgeon, called on plaintiff the morning after the accident and continued to treat her for about two weeks. After Dr. Brokaw ceased to treat her, Dr. Witherspoon was called in, but he not being a specialist in spinal trouble he recommended Dr. Crandall, who was called in, and he continued to treat the plaintiff up to the time of the trial. Plaintiff's evidence further tended to show that since her injury she was unable to do any work or even take care of herself; that she was unable to take a bath without assistance, and was as helpless as a child. She suffered a great deal of pain in her back, dizziness in her head, numbness in her limbs and severe pain in her hips and legs. She could get around a room by holding onto things for support and taking short steps, but since her injury she had not been out of the house except when carried out. Her expenses for medicines were estimated

by her daughter at from three to five dollars a week. Dr. Fry's bill for ten dollars was paid by her. Mrs. Talbott, a masseuse, was paid thirty-five dollars for treatment, but neither Dr. Crandall nor Dr. Witherspoon had yet presented his bill. Plaintiff was nursed through her suffering by her daughters, who she said were over eighteen years of age. Her daughter Marguerite testified, over defendant's objection, that the reasonable value of a nurse's service in the city of St. Louis was three dollars a day and three dollars a night, although she had never nursed for hire herself, and had only seen bills presented by nurses.

When Dr. Witherspoon was called to treat plaintiff, two or three weeks after the accident, he found no broken bones and no marks of physical injury. She showed evidence of traumatic neurasthenia, such as sensitive points along the spine; she was subject to dizziness at times, and appeared to be losing strength. He diagnosed the case as traumatic or "railroad spine," but as he was not a specialist in that line, he called in Dr. Crandall. The latter began treating plaintiff on July 10, 1902, about a month after the accident, and she was still under his care at the time of the trial. He found her condition was a nervous one, and on examination concluded that she had suffered concussion of the spine. She complained of dizziness, headache and sleeplessness, and walked with great difficulty and pain, all of which were symptoms of concussion of the spine, which is caused by a severe jar of the spinal column. In his opinion plaintiff was an invalid and would never permanently recover, and there was a possibility of a more serious organic condition developing. The symptoms were characteristic of nervous prostrations of any kind. The witness testified that the value of a trained nurse's service was three dollars a day and three dollars a night. His own bill was about three hundred dollars.

Dr. Frank R. Fry examined plaintiff after consultation with Dr. Crandall, and testified that she was suffering from neurasthenia or nervous exhaustion. She had suffered a great deal of pain, but presented no evidence of any organic disease, nor did she have any wounds of any kind upon her person. Witness was unable to say whether the condition was permanent or only temporary, but in his judgment she would never recover from her neurasthenia. He further testified that very often persons having troubles similar to the plaintiff's become well by a settlement of the litigation growing out of their injuries.

Plaintiff next offered in evidence section 1760 of the ordinances of the city of St. Louis, the fifth paragraph, which was the paragraph defendant was charged with having violated, providing that "conductors shall not allow ladies and children to leave or enter cars while the same are in motion."

Defendant's evidence tended to prove that the conductor, who was standing on the rear platform, gave the motorman a signal to stop the car in obedience to plaintiff's signal that she intended to alight. While the car was slowing down plaintiff stepped off the car to the street, which was wet and slippery, and fell, the car continuing to run about eight or ten feet thereafter. The conductor did not see her as she got up from her seat and stepped onto the running board, but saw her afterward when she was attempting to arise from the ground.

The court permitted plaintiff, over repeated objections by defendant, to ask the conductor as to alleged statements as to how the accident occurred, made by him to plaintiff and others in the presence of various witnesses after plaintiff had gotten up from the street. To contradict the answers made by the conductor to these questions plaintiff in rebuttal, over defendant's objections, was permitted to introduce the testimony

of plaintiff and witnesses Stone and Marguerite Gibney.

Dr. Dinsbeer, a passenger on the car sitting four or five seats behind plaintiff, saw her get up in the car and step to the ground before the car had come to a stop at the crossing. In alighting, her back was towards the front of the car and she fell backwards.

Charles S. Crawford, of Crawford & Newby, general paint manufacturers, who sat near the rear end of the car on the east side, testified that while the car was slowing up for the crossing he saw plaintiff deliberately step off the car backward, keep her equilibrium a second or two, and then fall over, the car running about ten or twelve feet before stopping.

J. D. Donnoway was sitting in the front seat (which was reversed), facing the rear of the car and near the running board. He saw plaintiff while the car was slowing down step off backward and fall to the street.

J. H. Brigham, sitting on the seat with Donnoway, testified that when the car was approaching Washington avenue, plaintiff got up to get off, and just before the car stopped she stepped down to the running board and stepped off the car backward, the car running six or eight feet further.

Dr. A. V. L. Brokaw examined plaintiff the day after the accident and attended her about two weeks. A week or ten days after he ceased treating her he went to see her and when he reached the house she was sitting by the window. He waited a few minutes for someone to let him in and when he was admitted to the house he found that plaintiff had gone up stairs and gotten in bed with her clothes and shoes on. After that he did not go to see her any more.

Dr. Paul Y. Tupper was appointed by the St. Louis court to examine plaintiff. This he did in the presence of plaintiff's physician, Dr. Crandall, in

April, 1903. He found plaintiff in bed, rather pale, nutrition fairly good. She was a little unsteady on her feet but the reflexes were normal. Her muscles were in fair condition; there was no lack of symmetry in the legs and thighs; there were no objective evidences of injury, and in his opinion she had no permanent injuries. Dr. Tupper further testified that neurosis is not his specialty, and a neurologist skilled in that subject who had attended plaintiff for a year or two would have opportunities superior to his for ascertaining her condition.

The first question presented for consideration upon this appeal is as to the action of the court in granting, upon the application of plaintiff, a change of venue from the circuit court of the city of St. Louis, where the action was first instituted.

It appears from the record that the case was called for trial on April 13, 1903, when the parties answered for trial, and, upon application of the defendant, a panel of special jurors was summoned for the trial of the cause. On the 17th day of April, 1903, the parties again answering ready for trial, the jurors composing the special venire were called into the jury box, and duly sworn by the clerk to true answers make to such questions as might be propounded to them touching their qualifications to sit as jurors in the trial of the cause; but being unable to finish the empaneling of the jury on said day, the court adjourned until the 18th day of April, 1903, when the panel was completed. Both parties then announced that they did not desire to examine the jurors further, but before the challenges were made and the panel of twelve selected to try the case, plaintiff filed an affidavit praying for a change of venue upon the ground that defendant had undue influence over the inhabitants of the city of St. Louis; that she obtained information and knowledge of such influence on the 18th day of April,

1903, and that a special jury had been awarded by the court for the trial of the cause, on the application of the defendant.

Defendant objected to the consideration of the application for change of venue upon the ground that no notice had been given defendant or its attorney, and that the application was presented too late, which said objections the court overruled and awarded a change of venue, sending the cause to the circuit court of Montgomery county. It does not appear from the bill of exceptions that the defendant saved an exception at the time to the action of the court in awarding the change of venue, which defendant should have done in order to have the action of the court in that particular reviewed here. [Stearns v. Railroad, 94 Mo. 317; State ex rel. v. McKee, 150 Mo. 233.] Nor was any point made in this regard in the motion for a new trial, which was likewise necessary, and in the absence of which the action of the court will not be reviewed by the Supreme Court. [Klotz v. Perteet, 101 Mo. 213.]

One of the grounds for new trial assigned by defendant in its motion is that one of the jurors trying the cause was prejudiced and biased. The juror, Samuel A. Moore, upon his *voir dire* examination testified in effect that he had no business relations with or interest in the St. Louis Transit Company, and that he had no bias or prejudice against the parties, or either of them. Upon these statements he was accepted by both sides as a competent and qualified juror. After the case had been submitted to the jury it was learned that Moore was one of a large number of employees of the defendant company who went on a strike in the city of St. Louis in May, 1900, the strike continuing for several months, during which time feeling between the strikers and their employers ran high; defendant's tracks were demolished by dynamite, and crimes, some

amounting to felonies, were committed by the strikers. As soon as defendant's counsel learned that Moore took part in said strike, the court was informed thereof. When the motion for new trial was heard, Moore was offered as a witness for plaintiff. He did not deny any of the charges made against him, his examination and evidence being confined solely to the questions asked on the *voir dire*.

"Q. On the hearing of the *voir dire*, that is to say, on the inquiry of the jury as to their qualifications, was there any question asked you by me or by counsel for defendant as to whether or not you had ever been in the service of the defendant St. Louis Transit Company? A. There was not.

"Q. Do you remember the question I put to you was this: 'Have you any relation of business or interest with the St. Louis Transit Company?' Do you remember that question? A. Yes, sir.

"Q. Well, what other question, if any, was asked you with regard to your relation with the Transit Company? A. There was none that I have any recollection of.

"Q. What further question was asked you as a juror? A. I don't remember what was asked; I don't remember.

"Q. Do you remember whether or not you were asked the question as to whether or not you had any bias or prejudice against the parties, or either of them? A. Yes, sir; I think I remember that.

"Q. What was your answer? A. My answer was I was not prejudiced in any way.

"Q. I will ask you if you did, as a matter of fact, have any prejudice either way in that case? A. No, sir."

The juror, however, did not admit or deny that he was an employee of the defendant at the time of the strike, or that he was one of the strikers.

It was shown by numerous affidavits filed by defendant in support of its motion for new trial that Moore was one of the leaders in said strike, and that during and on account of which a bitter feeling of hatred existed on the part of said strikers and others against the defendant, its officials, and those who refused to strike with them.

It is insisted by defendant, that aside from the issue of fact arising out of the juror's examination, the questions that Moore admitted were asked him required that he advise defendant's counsel of his disqualifications. Upon the other hand, plaintiff contends that although Moore may have been prejudiced against the defendant at the time of the strike, some three years before the trial, there was no evidence that he still retained the prejudice at the time of the trial, there having been a change in the management of the company in the meantime, and especially in view of the fact that on the hearing of the jury on the *voir dire* the said juror swore that he had no prejudice, and again swore on the hearing of the motion for a new trial that he had no such prejudice.

Moore admitted that he was asked upon his *voir dire* examination if he had any bias or prejudice against the parties, or either of them, and that his answer was, "I was not prejudiced in any way." Nevertheless, the evidence clearly shows that this juror was, at the time of the strike, biased and prejudiced against the defendant; and when asked upon his *voir dire* examination if he had any bias or prejudice against the defendant, he should, in justice to himself and in fairness to the defendant, have disclosed the fact of his connection with the strike. Would any sane person whose property rights were involved in a lawsuit knowingly, and without objection, permit a man to serve as a juror thereon who had, within three years next preceding, assisted in the wanton destruction of his prop-

erty, although such juror should answer upon his *voir dire* examination that he was not biased or prejudiced in any way? We think not. It is conceded by plaintiff's counsel that at the time of the strike Moore had resentment, but it is claimed, without any evidence to that effect except the sworn statement of Moore himself, that it is probable that, after the lapse of three years, with conditions changed, his feeling of prejudice had subsided. Men differ so much in respect of their ability and disposition to bear malice, that it will not do to say or assume that any particular person, who has become prejudiced against another, ceased to bear malice against him at any particular time, if at all. Besides, the general rule is that a certain state of facts once shown to exist is presumed to continue until the contrary is shown. In Pearcy v. Insurance Co., 111 Ind. 59, a juror named Bowman was asked whether he or any member of his family held any life insurance policy issued by the defendant. Appellee's affidavits showed that he was asked, "Did any of you hold a policy of life insurance issued by the defendant?" Bowman's affidavit stated that he was asked, "Did you hold a policy of life insurance issued by the Michigan Mutual Life Insurance Company?" but he did not deny the admitted fact that he had taken out a policy for the benefit of his wife. He also stated in his affidavit that he was influenced solely by the law and the evidence in making his verdict. The court said: "We think that the question asked the juror required him to answer as to the policy taken out on his own life for the benefit of his wife. This is our conclusion upon the assumption that the question was that which appellee maintains it was. It was not incumbent upon appellee to minutely cover by a long series of specific questions all phases of the subject, but it was enough to ask such a question as would indicate to the mind of a fair and reasonable man what information the

examining counsel sought to elicit. It seems clear that such a question as that asked Bowman ought to have drawn from him the fact that he had taken out a policy on his own life for the benefit of his wife, for the question certainly indicated that information as to his interest in the company, as well as his connection with it, was sought by the counsel conducting the examination."

In the case of Heasley v. Nichols, 80 Pac. 769, similar in many respects to this case, it was said: "If the true condition of his [the juror's] mind had been made known to the court before he was accepted as a juror, he would have been excluded at once. The parties had a right to rely upon his sworn statement, and waived nothing by accepting him as a juror. But when the attention of the court was called to the condition of the juror's mind in a proper way, it was the duty of the court to rectify the mistake by granting a new trial."

In Theobald v. Railroad, 191 Mo. l. c. 416, it is said: "There is no feature of a trial more important and more necessary to the pure and just administration of the law than that every litigant be accorded a fair trial before a jury, who enter upon the trial wholly disinterested and unprejudiced," and "it is for the court, and not for the juror, to determine his qualification. The determination should not be made to depend upon the conclusion of the juror as to whether or not he could or would divest himself of a prejudice which the evidence shows existed."

That the juror was prejudiced against the defendant, and was not for that reason a competent juror, was shown by the affidavits filed in the court below, and this fact was further emphasized by the exceedingly large and unjustifiable verdict rendered by the jury. That the defendant would not have permitted Moore to serve on the jury, without objection, had its

counsel been in possession of the facts disclosed by the affidavits, no one will doubt, and when the attention of the court was called to these facts it should have rectified the mistake by granting a new trial.

Plaintiff's instruction number 5 is criticised upon several grounds, only one of which, the third, will it be necessary to notice. By this instruction the plaintiff was allowed to recover, by way of damages, "any expenses necessarily incurred for nursing." The only persons who attended plaintiff as nurses were her daughters, members of her family. There was no express contract to pay them for their services, and defendant contends that the services are presumed to have been rendered gratuitously.

As a rule such services involve no legal liability upon the part of the person for whom rendered, and, therefore, afford no basis for a claim. In Voorheis on Damages for Personal Injuries, sec. 18, it is said: "The injured person cannot recover as expenses the value of the services of any one of his family in nursing him, unless there was an express agreement by him to pay therefor. Such nursing involves no legal liability on his part, and therefore affords no basis for a claim against the defendant, as for expenses paid. In the absence of an express contract, the law will not presume one, so long as the family relation continues. An injured person may hire an adult member of his family to nurse him, or to prescribe for him as a physician, in the same manner and with like effect that he may hire a stranger."

The same rule is announced in Goodhart v. Railroad, 177 Pa. St. l. c. 14, in which it is said: "The plaintiff cannot recover for the nursing and attendance of the members of his own household, unless they are hired servants. The care of his wife and minor children administering to his needs involves the performance of the ordinary offices of affection, which is their

duty; but it involves no legal liability on his part, and therefore affords no basis for a claim against the defendant for expenses incurred. A man may hire his own adult children to work for him in the same manner and to the same effect that he may hire other persons, but in the absence of an express contract the law will not presume one, so long as the family relation continues.''

This case was followed and approved by this court in Morris v. Railroad, 144 Mo. 500. That the authorities upon this subject are not entirely uniform may be conceded, but we think the rule announced in the Morris case and by the authorities which it follows is sustained by the better reason. It follows that said instruction is erroneous.

The verdict is so manifestly excessive and so out of reason when considered in connection with the facts in relation to plaintiff's injuries, their nature and extent and their probable effect upon her health in the future, and the expenses necessarily incurred for medical treatment, that the ends of justice will be best subserved by reversing the judgment and remanding the cause for another trial.

The judgment is reversed and the cause remanded. All concur.