William J. BEGGS, (Plaintiff) Respondent,

v.

UNIVERSAL C. I. T. CREDIT CORPORA-
TION, a Corporation, (Defend-
ant) Appellant.

No. 51144.

Supreme Court of Missouri,

En Banc.

March 8, 1965.

Lawrence F. Gepford, Donald L. Mason, John J. Hager, Kansas City (Mason, Gant, Gepford & Moran, Kansas City, of counsel), for respondent.

John W. Schwartz, Preston H. Longino, Kansas City, for appellant.

HOLMAN, Judge.

In this action plaintiff alleged that defendant unlawfully took possession of his truck (tractor) and towed it in a manner that caused it to be badly damaged. He sought actual damages in the sum of $2,900 and $15,000 for punitive damages. The trial resulted in a verdict for plaintiff in the amount of $2,500 actual and $13,000 punitive damages. As a condition for overruling the motion for new trial the court required a remittitur of $1,612.46 of the actual and $2,000 of the punitive damages. Plaintiff filed the remittitur and a final judgment was entered for plaintiff in the sum of $887.54 as actual damages and $11,000 as punitive damages, an aggregate of $11,887.54. Defendant appealed to the Kansas City Court of Appeals and that court adopted an opinion affirming the judgment. Upon defendant's application, we ordered the case transferred to this court and it will be determined here "the same as on original appeal." Civil Rule 84.05(h), V.A.M.R.; Mo.Const. Art. V, § 10 (1945), V.A.M.S.

On the dates hereinafter mentioned plaintiff was engaged in the trucking business. He had no certificates for public routes but engaged in private hauling primarily of heavy construction materials. He owned two Diamond T trucks, both of which were painted red. The 1958 model was a gasoline truck with a single axle, while the other was a 1959 diesel with double axle and vertical exhaust. The '58 truck cost about $8,000 and plaintiff obtained the purchase price by mortgaging it to his home bank. He purchased the '59 truck from the Hastings Motor Company of Hastings, Nebraska, for about $20,000, and financed it by executing a chattel mortgage for $19,837 to be paid at the rate of $550 per month. The motor company sold that mortgage to defendant Universal C.I.T. Credit Corporation.

On April 14, 1961, plaintiff was delinquent three payments on his '59 diesel, and a fourth payment became due that day. He had frequently been delinquent in his pay-

ments and on several occasions had given checks which did not clear the bank because of insufficient funds. For some time defendant had had difficulty in locating plaintiff and the truck on which it held a mortgage. Defendant had transferred the account to its Kansas City office and an employee of that office, Ray Price, had been instructed to collect the delinquent payments, or take possession of the truck. Late in the afternoon on the date above mentioned Price located plaintiff at the lot of Blue Valley Transfer Company. The '58 truck had just been driven onto the lot by plaintiff's driver, Lyle Marlay. Marlay testified that he parked the truck, locked the cab, and left the transmission in gear. Price told plaintiff he would have to pay three payments at that time or he would take possession of the truck. Plaintiff said he could not get the money until the following morning, but Price told him he would take possession of the truck and, if the payments were made the next day, the truck would be returned to plaintiff. Plaintiff testified that he told Price that defendant had no lien on the truck parked on the Blue Valley lot. Price denied that in his testimony and Marlay testified that he didn't hear any such statement. Plaintiff and Marlay then left the premises, and Price called a wrecker and had the '58 truck (which he obviously thought was the '59 truck upon which the defendant had a lien) towed away.

Three or four days later plaintiff found the truck on a filling station lot on South Main Street in Kansas City. He was of the opinion that the truck had been considerably damaged by having been towed while in gear, although Price testified that the cab was not locked and that the operator of the tow truck took the truck out of gear before starting the towing operation. Plaintiff had the truck towed to an International Harvester garage where repairs were made during the following week or ten days. Plaintiff later paid $1,090 for the repair work but conceded that at least $250 of that

amount was for repairs that had no connection with the damage allegedly caused by defendant. Plaintiff also testified that he lost from $500 to $600 in profits from loss of use of the truck during the time it was being repaired.

In its motion for new trial defendant alleged that it discovered, after the trial, that four jurors had failed to answer appropriate questions or had made false answers on voir dire examination, and had wilfully concealed certain facts concerning litigation in which they had been involved and financial difficulties they had had with other finance companies. The four jurors, Emory J. Holder, Nicholas Hernandez, Carl A. Bendert, and Donald R. Fitzgerald all testified at the hearing of the motion for new trial.

Near the beginning of the voir dire examination Mr. Gepford, plaintiff's counsel, asked, "Is there anybody on the panel who is now a plaintiff or defendant in a lawsuit? In other words, anybody who is suing somebody or who has been sued by somebody?" Mr. Holder then stated that he was a plaintiff in an automobile damage suit that had been pending about four years. Then the following question was asked: "Anybody else who is now a plaintiff or defendant in a lawsuit? Is there anybody who has been in the past a plaintiff or defendant?" In answer to that question a number of the jurors gave information concerning past lawsuits that they had been involved in, but nothing was said by any of the four jurors heretofore named. The panel was then examined by Mr. Schwartz, one of defendant's counsel. He asked this question: "Have any of you had any lawsuits or damage suits or claims of any kind against anybody, either as individuals or corporations, other than the ones who have told us here, told Mr. Gepford when he asked the question? To save time we will not go over it again. If there is any additional, we would like to know it at this time." None of the four jurors here involved made any response to that question.

Thereafter, each juror on the panel was examined individually by the attorneys. Each member of the panel was asked by Mr. Schwartz a question substantially in this form: "Have you ever had any trouble with any finance company?" We will hereafter give the questions asked the above-named jurors and in the same paragraph state their testimony at the time the motion for new trial was heard.

Carl A. Bendert: This prospective juror testified on voir dire as follows: "Mr. Schwartz: Have you ever had any trouble with any finance company in any way, shape or form? Mr. Bendert: No." At the after-trial hearing he testified as follows: "Mr. Schwartz asked you, 'Have you ever had any trouble with any finance company in any way, shape or form?' You answered 'No.' Now, in May 1962, didn't G.M.A.C. reposses an automobile from you? A. Yes, they did, but it wasn't actually any trouble. Q. Just answer my question. Was that because of back payments? A. Yes, sir. Q. How many payments were you behind? A. Three payments, I think. Q. You didn't tell us that when Mr. Schwartz asked that question, did you? A. No, because I didn't think it had any bearing on anything else except my personal business. Q. It was in your mind when you answered that question? A. Well, yes, I knew it. * * * Q. Now, did you ever have any problems with the Hickman Mills Bank taking back stuff of yours? A. Yes, I did. Q. Was that a TV, camera, automobile? A. Yes, sir. Q. And when did that happen, in July of 1961? A. Somewhere along there, yes. Q. Did you recall that when that question was asked you by Mr. Schwartz? Did you know that when he asked you that question? A. As I say again, I didn't think that had any bearing. Q. But you did know it, you remembered it when the question was asked you? A. Yes, I knew it."

E. J. Holder: This juror testified on voir dire as follows: "Mr. Schwartz: No trouble with any finance company? Mr. Holder: No." At the later hearing he gave the following testimony: "You remember being asked about having problems with finance companies? A. Yes. Q. Your answer was 'No.'? A. That is true. Q. Isn't it true that the Associated Discount Corporation filed a suit against you for repossession of an automobile in Judge Blackburn's court? A. That is true. Q. When was that? A. I don't recall exactly when it was. Q. Could it have been on the 25th of July, or thereabouts, 1960? A. Could have been, yes. Q. They got a judgment against you for $1,274.27 and repossession of the automobile, is that right? A. That is probably correct." Mr. Holder also testified that he had owed some $1,600 to Bankers Investment Company and it had repossessed a car from him; that in March 1962 he filed a petition in bankruptcy because he had been unable to pay the finance companies heretofore mentioned and also could not pay two lumber companies, and City Block & Products Company which had filed suits against him and obtained judgments. When asked to explain why he had not disclosed these repossessions on voir dire examination he replied, "I didn't consider it trouble. It was trouble for me, because I was loser, but not as to feeling ill against the finance company—because they were merely fulfilling their end of the contract and I wasn't." Later in the examination he stated that he "didn't think about it at all. It was past history as far as I was concerned."

Nicholas Hernandez: This juror likewise responded in the negative when asked if he had had any trouble with any finance company. In the later hearing it was shown that he had filed a wage earner's petition in bankruptcy in 1957 and was discharged in 1961. It was shown that three of his creditors were Seaboard Finance Company, Family Finance Corporation, and Employees' Credit Union of Swift & Company. When asked to explain why he had not disclosed this information on voir dire he stated, "Well, I remembered the wage earner matter. I didn't figure that would be —you say I was having trouble with the

finance company, I never had any trouble with them. I was just in way over my head and I had to do something to protect myself and my family."

Donald R. Fitzgerald: Mr. Fitzgerald failed to make any answer when the entire panel was asked if any of them had ever been a party to a lawsuit. At the after-trial hearing he testified that he had filed a suit about two years before the instant trial seeking $50,000 damages for personal injuries, and that the suit was settled a few months thereafter for approximately $4,500. Mr. Fitzgerald conceded that he remembered this lawsuit when the questions were asked but he didn't disclose that fact because he didn't feel it had anything to do with this case. He later stated that he thought the question meant the same type of lawsuit that was then on trial.

Each of the jurors also testified, usually in response to a question by the court, that he did not knowingly or wilfully conceal or refuse to reveal any information. At the conclusion of the hearing the trial court found "that there was no intentional concealment of information, or wilful failure to disclose information, by jurors Hernandez, Fitzgerald, Holder and Bendert."

As indicated, it is the contention of defendant that the trial court erred in overruling its motion for a new trial after it was disclosed that four of the jurors selected to try the case had wilfully failed to disclose prior lawsuits and difficulties with finance companies, although they were questioned generally and specifically on voir dire concerning such matters. Plaintiff's reply to that contention is that the trial court's ruling on the motion should not be disturbed because that court did not abuse its discretion in finding that the four jurors did not wilfully or intentionally conceal information in responding to the voir dire examination.

■ The rules to be considered in our determination of the question presented are well settled. "The constitutional right of every citizen to a trial by jury to be meaningful contemplates a fair and impartial jury. The jury should consist of twelve impartial, qualified jurors. Even though three-fourths of them can decide a civil case, parties are entitled to have that decision, whether for them or against them, based on the honest deliberations of twelve qualified jurors. Lee v. Baltimore Hotel Co., 345 Mo. 458, 136 S.W.2d 695, 127 A.L.R. 711. It is the duty of a juror on voir dire examination to fully, fairly and truthfully answer all questions directed to him so his qualifications may be determined and so that challenges may be intelligently exercised. It makes no difference whether the unanswered or untruthfully answered question was one asked to the panel generally or to the particular juror individually. So long as he hears the question and understands that it calls for an answer by him as a member of the panel, even though it may be directed to the panel generally he is not relieved of his duty to answer." Brady v. Black and White Cab Co., Mo.App., 357 S.W.2d 720, 725. A prospective juror may not be the judge of his own qualifications. "[A] juror's intentional concealment of a material fact may require the granting of a new trial. Woodworth v. Kansas City Public Service Co., Mo., 274 S.W.2d 264. For bias and prejudice on the part of a juror may be inferred from his intentional concealment of such information. Girratono v. Kansas City Public Service Co., Mo., 272 S.W.2d 278. * * * In the final analysis, therefore, the question of what result should follow the failure of a juror to correctly answer a question touching his qualifications depends upon whether or not he was guilty of an intentional concealment. Primarily, the determination of that question must be left to the sound discretion of the trial court. Reich v. Thompson, 346 Mo. 577, 142 S.W.2d 486, 129 A.L.R. 795. Nevertheless, the exercise of such a discretion is subject to judicial review, and if an appellate court concludes from the record that an abuse of discretion unmistakably appears, it is its duty to reverse the ruling.

Piehler v. Kansas City Public Service Co., supra, [357 Mo. 866, 211 S.W.2d 459]; Harrison v. St. Louis Public Service Co., Mo.App., 251 S.W.2d 348." Triplett v. St. Louis Public Service Co., Mo.App., 343 S.W.2d 670, 672, 673.

A review of the evidence in this case has convinced us that the jurors in question wilfully and intentionally withheld information which should have been disclosed on voir dire examination. That being true, the defendant sustained prejudice in that it did not have a trial before a fair and impartial jury of twelve persons and we therefore rule that the trial court abused its discretion in overruling the motion for new trial. See Maddox v. Vieth, Mo.App., 368 S.W.2d 725, Triplett v. St. Louis Public Service Co., supra, Brady v. Black and White Cab Co., supra, Woodworth v. Kansas City Public Service Co., Mo.Sup., 274 S.W.2d 264, Gibney v. St. Louis Transit Co., 204 Mo. 704, 103 S.W. 43, and Piehler v. Kansas City Public Service Co., 357 Mo. 866, 211 S.W.2d 459.

The prospective jurors were unequivocally asked if they had in the past been a plaintiff or defendant in a lawsuit. None of the four jurors heretofore named made any response. Mr. Fitzgerald later admitted that he had filed a suit two years before which had been settled for $4,500. He remembered this suit when the panel was examined but stated that he did not respond because (1) he did not feel it had anything to do with this case, and (2) he thought it meant the same type of lawsuit. Neither was a valid excuse. He had no right to make the decision that his case need not be disclosed because he thought it had nothing to do with the case on trial. There was also nothing in the question which would reasonably support his conclusion that it referred only to cases of the same type as the one on trial.

Mr. Holder, likewise, failed to disclose that five creditors had obtained judgments against him. He should have disclosed those judgments in response to the general question concerning lawsuits. He was also asked if he had had any trouble with any finance company. Two of those judgments had been obtained by finance companies and those companies had repossessed cars from him. We think the word "trouble," as used in that question, would reasonably be construed to include lawsuits and repossessions by finance companies. This venireman offered no reasonable excuse for his failure to disclose those matters.

Mr. Bendert had had a car repossessed by a finance company, and an automobile, T.V. and camera repossessed by a bank. It does not clearly appear whether or not suits were filed in order to obtain possession of those items. However, in any event, we think those repossessions constituted "trouble" which the juror had had with those lenders and that he should have disclosed them. He had them in mind and his only excuse for nondisclosure was that he thought those matters had no bearing "on anything else except my personal business." The excuse was insufficient.

We need not discuss the alleged failure of Mr. Hernandez to disclose his "trouble" with finance companies, as the failure of the other three jurors to make disclosures, as heretofore discussed, is ample to support the conclusions we have reached.

In support of his contention that the trial court did not err in overruling the motion for new trial plaintiff has cited the following cases: Begley v. Adaber Realty & Inv. Co., Mo.Sup., 358 S.W.2d 785, Harrison v. St. Louis Public Service Co., Mo.App., 251 S.W.2d 348, Hampy v. Midwest Hanger Co., Mo.App., 355 S.W.2d 415, and Hornberger v. St. Louis Public Service Co., Mo.Sup., 353 S.W.2d 635. In each of those cases the court, under varying factual situations, held that the trial court did not abuse its discretion in failing to grant a new trial because of nondisclosure by a venireman. Those cases are all distinguishable from the case at bar upon the facts involved.

We also have the view that the fact that the jury returned a verdict for actual dam-

ages in an amount which was at least $1,000 more than the evidence could possibly justify tends to support our conclusion that the case was not tried before a fair and impartial jury.

For the reasons stated, the judgment is reversed and cause remanded for a new trial.

EAGER, C. J., and STORCKMAN, HYDE, HENLEY and FINCH, JJ., and STONE, Special Judge, concur.

DALTON, J., not sitting.