Dorothy CIGNETTI and Robert
Cignetti, Plaintiffs-Respondents,

v.

H. Marvin CAMEL, M.D.,
Defendant-Appellant.

No. 47791.

Missouri Court of Appeals,
Eastern District,
Division Two.

May 7, 1985.

Motion for Rehearing and/or Transfer to
Supreme Court Denied June 5, 1985.

Parks G. Carpenter, St. Louis, for defendant-appellant.

Martin J. Toft, St. Louis, for plaintiffs-respondents.

STEPHAN, Judge.

Defendant, H. Marvin Camel, M.D., appeals from a judgment against him in this medical malpractice action. Plaintiffs, Dorothy and Robert Cignetti, sought damages for injuries and loss of consortium, respectively, arising out of the negligent treatment provided by defendant, an obstetrician-gynecologist, to Dorothy Cignetti during her pregnancy. Dorothy suffered a ruptured uterus which caused the death of the fetus and necessitated defendant's performance of a hysterectomy. The jury returned verdicts of $300,000 in favor of Dorothy Cignetti and $100,000 in favor of Robert Cignetti, on which judgment was entered. This appeal followed. We affirm.

Dorothy Cignetti first consulted Dr. Camel in March 1976. She was concerned about her inability to become pregnant after she had ceased taking birth control pills. At that time she and Robert had been married about 7 months. Both were interested in having a family and children. Toward that end she stopped taking the pills after they returned from their honeymoon.

At that initial consultation, Dorothy gave her medical history. She had had one child previously, who was delivered by Caesarean section. That child and her first husband are now deceased. She told Dr. Camel that she had been told after her first pregnancy that she would have to deliver by Caesarean section if she had any more children. She also related her post-operative problems after her first Caesarean section. An intestinal obstruction had developed, requiring a laparotomy to be performed. Adhesions also had to be removed. When she asked Dr. Camel if he wanted to obtain her medical records from that time he refused, claiming that such things were not done anymore.

The evidence showed that Dorothy Cignetti's first operation had been a "classical" Caesarean section. In this operation a vertical incision is made along the length of the uterus. The incidence of uterine rupture during subsequent pregnancies was shown to be higher with this type of operation than with "transverse" Caesarean sections where the incision is made across the lower portion of the uterus. The time when a rupture would occur, if at all, also varied with the type of operation. After a classical section, rupture would be most likely to occur during the first 38 weeks of pregnancy or at the very outset of hard labor, while a transverse scar was more likely to rupture during labor. This variation corresponded to the times when the greatest stress was placed on the weakened tissue. Defendant was able to determine the type of Caesarean section which had been performed by the position of Dorothy's scar.

Dorothy continued to consult with defendant's staff for pregnancy tests, and in June 1976 it was determined that she was pregnant. A due date of December 10, 1976 was estimated. Dorothy was in generally good health and she continued to see defendant on a monthly basis. The pregnancy proceeded without incident until November 25, although examinations on November 15 and 22 revealed that the fetus was in a breech position. Upon repeated inquiries by Dorothy, defendant stated he would decide whether to deliver the baby by Caesarean section when the time came.

November 25 was Thanksgiving Day. Dorothy had a fairly large dinner at a family member's house at about 5:00 p.m. Robert and she returned home between 9:00 and 9:30 that night. At about 11:00 p.m. she awoke with severe pain. The pain was located under her right breast. After about two hours of trying to make her feel

more comfortable, which was to no avail, Robert called defendant. After inquiring about Dorothy's dinner, Dr. Camel advised Robert to take her to Barnes Hospital (Barnes).

When they arrived at Barnes, Dorothy was examined by a resident physician. He performed some tests and determined that she was not in labor and that the baby had moved to the normal head-down position. She was having some irregular contractions, which were normal for a woman in her stage of pregnancy, but were not indicative of labor. She was given a shot of morphine and sent to the Labor and Delivery floor where she was able to sleep the rest of the night.

On Friday morning, Dorothy still complained of pain, which was worse when she breathed deeply. Dr. Camel saw her about 11:00 a.m. and explained that he wanted to perform a procedure called amniocentesis. This involved extraction of amniotic fluid. The fluid was then tested to determine the maturity of the fetus' lungs. The results of the test, a figure called an L/S ratio, indicated that the lungs were not fully matured, but the significance of the results was otherwise hotly contested. The contrasting views are dealt with below. After the test Dorothy was returned to her room in the Labor and Delivery area, where she remained until about 8:00 p.m. When monitoring showed normal fetal heart tones and that she was still not in labor, she was transferred to the obstetric floor. Throughout most of the day Friday, Dorothy was attended to by a nurse, Zenobia Thompson.

At some time Friday, defendant diagnosed Dorothy's problem as a gallbladder attack, unrelated to her pregnancy. He based this on her having had a large, fatty meal on Thursday and her reaction to the morphine that had been given to her for her pain. She had complained that the morphine made her pain worse, and one time she refused it. Morphine will aggravate pain from a gallbladder attack; the only condition on which it has this effect.

Dorothy had never had any prior gallbladder problems, nor has she had any since.

The record is somewhat unclear as to the events of Saturday morning. Dorothy testified that she awoke early Saturday with pain in her abdomen. She was given a shot for the pain and fell back to sleep. Dr. Camel saw her between 7:00 and 8:00 and spoke with her. He told her the fetus' lungs were immature, and that they would test again the next Tuesday. No other options were discussed. Dorothy told him she was not in pain; she had just received a shot. She asked if she could go home, because, as she explained at trial, she felt nothing was being done for her at the hospital, except that she received a shot every time she complained. She also felt that if her problem was merely with her gallbladder or indigestion, as she had been told, that her husband could care for her. Defendant, however, advised her to remain in the hospital, and she complied.

After defendant's visit, Dorothy slept again until about 9:00 or 9:30. She telephoned her husband to tell him the results of the test. Then she was seized by an acute abdominal pain. She described a bearing down sensation. She had difficulty breathing. She was unable to relax until she was given another shot. The head of the bed was also raised, which provided some relief. Apparently she was still in discomfort, but the acute pain seemed to pass.

At about 11:15, Dorothy was sitting in a chair in her room, picking at her lunch. Robert had put a towel or napkin on her lap. She thought she felt the baby kick and the cloth fell to the floor. Because she did not want to eat, she had Robert help her back to bed. She was then stricken with severe pain in her abdomen. She screamed for a nurse. A nurse and doctor came in to the room. They tried to get fetal heart tones, which apparently were weak. Dorothy soon appeared to go into shock, and was then taken to an operating room.

Sometime between 3:00 and 4:00 p.m. Dr. Camel was called at home, by a resident,

Dr. Mann. Defendant was told that either Dorothy's uterus had ruptured or the placenta had separated and that she was in shock. Defendant arrived at the hospital in less than 10 minutes and operated on her immediately.

The fetus was found dead outside the uterus. It had died from a lack of oxygen. Dorothy's uterus had split in the position of her old scar. It was described as almost bivalved, as if it were cut through. Defendant performed a sub-total hysterectomy. Dorothy's condition then stabilized and her blood pressure began to rise. At some time after the operation, Nurse Thompson showed the Cignettis the baby.

Following the surgery, Dorothy's physical recovery proceeded well. She was able to return to work in January 1977. However, she was unable to socialize with friends who had small children. Of course, she can no longer bear children.

Defendant raises six points on appeal. The first alleges that plaintiffs failed to present sufficient evidence to allow the jury to find defendant was negligent. Defendant's second point is that the trial court erred in not granting him a new trial because the verdict was against the weight of the evidence. Third, defendant argues that he is entitled to a new trial because the verdict is excessive and the result of bias, passion and prejudice. The fourth and fifth points relate to matters occurring during the testimony of Nurse Thompson. Last, defendant attacks plaintiffs' verdict directing instructions.

■ In determining whether plaintiffs presented a submissible case we view the evidence in the light most favorable to the verdict. We accept plaintiffs' evidence as true and disregard defendant's evidence, except as it may aid plaintiffs' case. *Yoos v. Jewish Hospital of St. Louis*, 645 S.W.2d 177, 183 (Mo.App.1982). The jury's finding of negligence may not rest on mere speculation or conjecture. *Rauschelbach v. Benincasa*, 372 S.W.2d 120, 125 (Mo.1963).

■ The elements of a claim of medical malpractice are: 1) an act or omission by the defendant, 2) that was not in keeping with the degree of skill and learning ordinarily used under the same or similar circumstances by the members of defendant's profession (i.e. negligence), 3) which resulted in plaintiff's injury. *Yoos, supra*, at 183; *Cebula v. Benoit*, 652 S.W.2d 304, 307 (Mo.App.1983).

Defendant's attack on the submissibility of plaintiff's case focuses primarily on the second element. He contends that plaintiffs failed to prove negligence because the testimony of their expert witness was internally inconsistent and contradictory so as to be devoid of probative value. Defendant argues that this was the only evidence supporting plaintiffs' claim of negligence and that defendant was, therefore, entitled to a directed verdict.

Defendant's second point is closely related to the first. In it defendant contends that even if plaintiffs' expert's testimony was legally sufficient, its probative force was so minimal that the verdict which relied on it was clearly against the weight of the evidence, and ought to be set aside. We consider the points together.

Plaintiffs' only expert witness was Albert Kapstrom, M.D., a physician who specializes in obstetrics and gynecology. He testified clearly and unequivocally on direct examination that the care provided by Dr. Camel did not comport with the standard of care for an obstetrician-gynecologist practicing in 1976. Defendant concedes that Dr. Kapstrom so testified, but contends that later testimony contradicted this statement, and thereby rendered the whole of Dr. Kapstrom's testimony not credible. We disagree.

In answering the question hypothesizing the alleged negligent act, Dr. Kapstrom relied on and stressed the individual circumstances presented by Mrs. Cignetti. These included the stage of her pregnancy, her prior history of delivery by Caesarean section, her complaints of pain, and the maturity of the fetus. In addition, he relied on the hospital facilities available for treatment of the infant in the event it was born prematurely. While acknowledging

that the fetus' L/S ratio was below 2.0, the threshold for delivery according to defendant's experts, Dr. Kapstrom maintained that it was within a gray area where delivery would be medically advisable in view of the mother's condition and history. He agreed that there was still a risk of death for the infant, but maintained that this was outweighed by the virtual certainty of death in the event of uterine rupture. The risk of uterine rupture in women who have had prior Ceasarean sections is about 1%.

■ Dr. Kapstrom's testimony, when taken as a whole, is not so inconsistent or contradictory as to be devoid of credibility. He maintained that the appropriate standard of care would have dictated that delivery by Caesarean section be performed as soon as the fetus' L/S ratio was in the gray area. The gray area was the range of 1.7 to 2.0. The information before defendant on Friday afternoon was that the L/S ratio was 1.8 to 1.9. Dr. Kapstrom's position was that the risks involved in not performing the operation clearly outweighed those involved in performing it. The statistics, with which he agreed, do not refute his testimony, because he maintained that they cannot be precisely applied to individual patients. We note that even some of defendant's experts showed a reluctance to rely on statistics. Dr. Kapstrom never stated the risk of rupture for Mrs. Cignetti was only 1%. His position was that the risk was great enough to outweigh the risk of performing a Caesarean section, so that the failure to perform it violated the standard of care as it existed at the time. This does not make his testimony incredible as a matter of law. Rather, it merely raises competing inferences for the jury to choose. As was said in *Yoos, supra,* 645 S.W.2d at 183, "The evidence is sufficient to make a submissible case if a reasonable probability that the defendant was negligent may be fairly inferred from it." Such test was met here.

Defendant also argues that Dr. Kapstrom testified that it would have been improper for defendant to have performed a Caesarean section without his patient's consent. It is undisputed that Dorothy never expressly consented to a Caesarean section. Thus, defendant argues, he could not be found negligent for failing to do that which he was not authorized to do.

■ Dr. Kapstrom also testified that proper care would dictate full disclosure of the relative risks involved in both courses of treatment. Dorothy's withholding of consent, he maintained, was incompetent because she was not apprised of all relevant facts. She was simply told that the fetus' lungs were immature. Dr. Kapstrom's testimony was that the lungs were mature enough to allow for delivery. The issue of her consent was tied to the other critical issues, whether, considering the relative risks, ordinary medical care dictated performance of the Caesarean section. We find no indication that consent would have been withheld had she been told that common medical practice dictated performance of a Caesarean section, as Dr. Kapstrom said it did. Her testimony was that she would not have consented to delivery of the baby with immature lungs. However, Dr. Kapstrom testified that the lungs were mature enough for delivery. The jury could easily have found that she would have consented had she been told that the lungs were mature enough for delivery. Absence of Dorothy's affirmative consent under these circumstances did not destroy plaintiffs' case.

■ Turning to defendant's second point, we find no error in the denial of the motion for new trial on the ground that the verdict was against the weight of the evidence. Defendant concedes that the trial court is afforded broad discretion in ruling on such a motion, *Bennett v. North Brighton Townhouses, Inc.,* 609 S.W.2d 186, 191 (Mo.App.1980), but urges us to rule that the court abused its discretion here. We decline to do so. Dr. Kapstrom's testimony was consistent. His agreement with the statistics may have lent some support to the views of defendant's experts, but he clearly showed his disagreement with the conclusions the experts reached. Further, he stated the factors supporting his own

opinion. Thus, there were simply competing inferences arising from the testimony. The jury was free to choose either. We find no error in the court's not interfering in their choice.

■■■ The third point alleges that the verdicts are "excessive and motivated by bias, passion, prejudice, sympathy and misconduct on the part of the jury." This claim, if supported by the record, can be cured only by a new trial. *Smith v. Archbishop of St. Louis*, 632 S.W.2d 516, 524 (Mo.App.1982). To prevail on this claim on appeal, defendant must show two things: first, that the evidence, when viewed in the light most favorable to the verdict, does not warrant such a verdict; and second, that there was some error or errors sufficient to incite prejudice. *Id.*

Defendant cites to matters at trial which allegedly prejudiced the jury against him. The first is a series of incidents during which there were allusions to misconduct of hospital employees, such as less than diligent record keeping and skepticism on the part of some nurses concerning Dorothy's pain. The second was Nurse Thompson's testimony that she showed the Cignettis the dead baby, after the fact had already been established by Robert's testimony.

■■■ We first consider the alleged excessiveness of the verdict. "The day is past when [Missouri appellate courts] engage in close scrutiny of the amounts awarded by juries for personal injuries. We rely on the trial judge." *Fowler v. Park Corp.*, 673 S.W.2d 749, 758 (Mo. banc 1984). We interfere only where there has been an abuse of discretion. *Id.* Here we recognize that this award is substantial, but we cannot say with any degree of confidence that the verdict is so excessive as to indicate jury misconduct.

■■■ Nevertheless, we have also examined the alleged errors, and do not find them to be errors. The evidence necessarily had to show the events that occurred during Dorothy's hospitalization. While this may have included evidence of negli-

gence by Barnes employees, for which defendant was not responsible, we find much of it to have been relevant to plaintiff's case. Moreover, to the extent that such evidence tended to cast blame on others, it could well have had the effect of diluting defendant's responsibility in the eyes of the jury. Here, the court was in the difficult position of assuring both sides a fair trial; trying to exclude unduly prejudicial evidence while allowing plaintiffs to present their case. "[P]arties are entitled to a fair trial ... not necessarily a perfect one." *Fowler, supra* at 757. We are satisfied that the standard of fairness was met and find no error.

■■■ Neither do we find error in Nurse Thompson's testimony that she showed the baby to the Cignettis. There is no indication in the record that this was done in an emotional manner, or that it evoked an emotional response from anyone in the courtroom. Nurse Thompson was instructed to "cover the facts without elaborating or emoting about them." She did just that. She testified simply and directly that, after the operation, the Cignettis indicated that they wanted to see the baby; she returned to the operating room, "... cleaned the baby up which just required, you know, removing blood and mucus, wrapped the baby in a blanket and brought the baby to the Cignettis." Immediately thereafter plaintiff's counsel moved on to other matters. We find no undue emphasis on the testimony, and therefore find no abuse of the court's discretion.

■■■ The fourth point attacks the court's rulings on various objections during the testimony of Nurse Thompson. Defendant contends that the court allowed her to give expert medical testimony when she, as a nurse, was not qualified to give these opinions. Again defendant raises a point which is reviewable only for an abuse of discretion. We find none and deny the point.

■■■ Defendant cites to two points during the testimony of Nurse Thompson where he alleges the court allowed her to

give expert testimony. The first concerned a conversation she had with defendant before the rupture. During this conversation Nurse Thompson told defendant that she did not think Dorothy had indigestion because the pain was "unrelenting" and did not present "the signs and symptoms of indigestion." Defendant objected that such statement constituted a medical diagnosis by a nurse. The trial court allowed the testimony as a conversation between Nurse Thompson and the defendant; and, indeed, Nurse Thompson's statements were made to defendant on November 26 when she and defendant left Dorothy's room, "to discuss my [Thompson's] assessment of the patient throughout the day ..." Since the revision of Chapter 335, RSMo in 1975, it has been clearly contemplated that a registered nurse is authorized to make an "assessment" of persons who are ill and to render a "nursing diagnosis," § 335.016(8) in her capacity as a professional adjunct to the treating physician. See *Sermchief v. Gonzales*, 660 S.W.2d 683, 689–690 (Mo. banc 1983). The statement to which Nurse Thompson testified was made in a conversation in which defendant was soliciting her "assessment" of Dorothy's condition as part of his decision-making process as to appropriate treatment. The critical issue was whether defendant's failure to perform a Caesarean section was negligent. The facts and circumstances which were within defendant's knowledge at the time he made his decision are particularly relevant to a resolution of that issue. *See Goodenough v. Deaconess Hospital*, 637 S.W.2d 123, 126 (Mo.App.1982). The conversation was a part of plaintiffs' showing of defendant's knowledge. Thus, we are not presented with a situation where plaintiffs impermissibly sought to show the standard of care through the testimony of a non-expert. *See Cebula v. Benoit*, 652 S.W.2d 304 (Mo.App.1983). We find no error in the admission of this testimony.

Later in her testimony, Nurse Thompson stated that, after Dorothy's surgery, she encountered defendant and he said, "Zenobia, you called it, and you were right." And she responded, "Well, I am sorry but that's how I felt." When defendant asked why she felt that Dorothy should have had a Caesarian section, Nurse Thompson responded that, "I told him where I took my training from we never called a patient a crock and a turkey." Objection to the latter statement was sustained, and the trial court instructed the jury to disregard it. The trial court permitted defendant's counsel to interrupt Nurse Thompson's direct examination "on a voir dire basis" and establish that she had not meant that defendant had referred to Mrs. Cignetti as a "crock" or a "turkey." She stated that defendant made no derogatory remarks about Mrs. Cignetti.

 Neither of these statements constituted the expression of an expert opinion. Her testimony to the effect that defendant stated that she was "right" was properly admissible as an admission by a party opponent. *Cummings v. Tepsco Tennessee Pipe and Supply Corporation*, 632 S.W.2d 498, 501 (Mo.App.1982); *Yamnitz v. Polytech, Inc.*, 586 S.W.2d 76, 82–83, (Mo.App.1979). And the inflammatory nature of the reference to "crocks" and "turkeys" was swiftly neutralized by the court's instruction to the jury to disregard it, along with the witness' explanation that she did not mean that defendant had used such words. The point is denied.

Defendant's fifth point asserts that the trial court erred in denying him the opportunity to show that Nurse Thompson had been discharged by Barnes Hospital. He sought to use this fact to show she was biased against him. The record does not support this claim.

During re-cross examination of Nurse Thompson, defense counsel asked her, "You have no great love for Barnes Hospital now, do you?" Before an answer was given, a discussion was held out of the hearing of the jury in which plaintiffs' attorney stated that, if the question were answered, he intended to explore all facets of Nurse Thompson's relationship with the hospital. Defense counsel argued that "the details of the discharge have nothing

to do with this case" and stated that he wished only to place the fact of the discharge before the jury and asked that plaintiffs' attorney "be barred from going into the matter further." When the trial court indicated he would not issue any such anticipatory ruling and would rule on follow-up questions as they were objected to, defense counsel withdrew the question and terminated his examination of the witness.

The record is silent as to what evidence defense counsel feared would develop if plaintiffs' attorney were allowed to probe the details of the witness' dismissal, thus prompting him to withdraw his question. When the bias of a witness is the subject of interrogation, the trial court has broad discretion as to the extent of the examination. *Vosevich v. Doro, Ltd.,* 536 S.W.2d 752, 760 (Mo.App.1976). On the record before us, we cannot hold that the discretion was abused when the trial court refused to bar plaintiffs' attorney from providing the witness an opportunity to explain any answer she might have given. Furthermore, it is a "well established" principle, that redirect examination is an appropriate method to rehabilitate a witness and to clarify any doubts as to the import of his testimony created by cross-examination. *Turner v. Caldwell,* 349 S.W.2d 493, 496 (Mo.App.1961). Appellant's point is without merit.

Defendant's final point attacks plaintiffs' verdict directing instructions. The two instructions, identical except for the plaintiff's name, read as follows:

> Your verdict must be for plaintiff, Dorothy Cignetti [Robert Cignetti] if you believe:
>
> First, defendant failed to perform a timely Caesarean section and,
>
> Second, defendant was thereby negligent and,
>
> Third, as a direct result of such negligence, plaintiff Dorothy Cignetti [Robert Cignetti] sustained damage.

In accordance with MAI 11.06, the jury was also instructed that, "The term negligent or negligence as used in these instructions means the failure to use that degree of skill and learning ordinarily used under the same or similar circumstances by the members of defendant's profession."

Defendant's attack focuses on the language in the verdict directors, "failed to perform a timely Caesarean section," and particularly the word "timely." He contends that because no "timely" operation was performed, in the sense that it prevented a rupture, the instructions allowed the jury to impose liability simply because of the failure to operate. A proper submission, he contends, would have been that he failed to adequately consider the risk of uterine rupture. The submission would leave the decision to operate in the field of medical judgment.

Defendant's argument misconstrues plaintiffs' theory. That theory, supported by Dr. Kapstrom's testimony, was that the failure to perform the Caesarean section was negligent. From Dr. Kapstrom's testimony, the jury could find that medical judgment left no room for a decision not to operate. Thus, contrary to defendant's contention, he had an absolute duty to perform a Caesarean section, because exercise of the degree of skill and learning ordinarily used by members of his profession would allow him to make no other decision. Plaintiffs had the right to choose any theory that was supported by the evidence. *Yoos v. Jewish Hospital of St. Louis,* 645 S.W.2d 177, 191 (Mo.App. 1982). Here their theory was supported by the evidence, and it was properly submitted.

Defendant further asserts that the verdict directors were improper because he could not converse Paragraph First of either. Had the instructions submitted a failure to consider the risk of uterine rupture, as he contends they should have, he could have conversed that element.

Defendant's argument is true, but it fails to show there was any error in the instructions. That defendant failed to perform a Caesarean section was an uncontroverted fact. The disputed issue was whether that failure was negligent. A converse was im-

possible because defendant's failure to act was accepted as true. However, such is the case whenever the sole question to be resolved is whether a given act or omission constitutes negligence. Defendant's position is, in essence, a reiteration of his contention that the failure to perform an operation cannot, of itself, constitute negligence. We do not accept this proposition. Dr. Kapstrom's testimony, which the jury apparently believed, was that the failure to perform the operation when the L/S ratio was above 1.7, as it was the day before the rupture, amounted to negligence. Thus, a factual question was raised, which the instructions put to the jury. We find no error.

The judgment is affirmed.

SIMON, P.J., and JOSEPH G. STEWART, Senior Judge, concur.