**Yvonne SCHILES, Julie Ann Schiles and Vickie Kristine Schiles, by and through their natural parent and next friend Yvonne Schiles and Evelyn Schiles, Plaintiffs-Respondents,**

v.

**Glennon SCHAEFER, M.D., Ernst Radiology Clinic, Inc., Richard H. Butsch, M.D. and St. Joseph's Hospital, Defendants-Appellants.**

No. 49559.

Missouri Court of Appeals,
Eastern District,
Division Two.

March 18, 1986.

Motion for Rehearing and/or Transfer Denied April 22, 1986.

Application to Transfer Denied June 17, 1986.

Ben Ely, Jr., St. Louis, for Glennon Schaefer, M.D.

Myron S. Zwibelman, St. Louis, for Ernest Radiology Clinic.

Joseph H. Mueller, St. Louis, for Dr. Richard H. Butsch.

James E. Hullverson, Sr., St. Louis, for plaintiffs-respondents.

REINHARD, Judge.

In this wrongful death action, defendants appeal after a unanimous jury verdict for plaintiffs in the amount of $1,500,000. We affirm as modified. Plaintiffs, the wife, mother and two minor children of James Schiles, alleged in their petition that decedent died as a result of defendants' failure to diagnose and treat decedent's pulmonary embolization.[1] At the time of his death, Mr. Schiles was 37 years old and was employed as personnel manager for Sunmark Manufacturing, with income for the prior year of $35,208. His wife was not employed during the ten years prior to his death.

The series of events which culminated in Mr. Schiles untimely passing began when Dr. Butsch, an internist, referred decedent to Dr. Schaefer, a surgeon, after diagnosing gall bladder disease. Decedent was hospitalized in St. Joseph's Hospital on May 31, 1981, and underwent gall bladder surgery on June 1. The surgery, performed by Dr. Schaefer, was apparently successful and decedent was discharged from the hospital on June 6.

At 5:00 a.m. on June 11, 1981, decedent was readmitted to the hospital after presenting himself to the emergency room with complaints of abdominal and back pain associated with a fever and an elevated white blood cell count. A set of chest x-rays was taken, which showed nothing "remarkable." Dr. Schaefer saw decedent every day during this second hospitalization. The nurses' notes from decedent's second hospitalization indicate that on June 11 and June 14 decedent coughed up some blood. The June 15 entry reports that at noon, decedent was: "Ambulated through hallways, complaining sudden on-set of gripping back pain. Slightly diaphoretic [perspiring] and pale.... States feels as if he is hyperventilating. Encouraged to take deep breaths. Very anxious." In addition, decedent had a temperature of 100 degrees, and an elevated lactate dehydrogenase level, indicating tissue damage.

On the morning of June 16, Dr. Schaefer stopped by decedent's hospital room and talked with decedent and his wife. Mrs. Schiles testified that they informed Dr. Schaefer that decedent had coughed up more blood that morning and showed him a kleenex with blood on it. She also testified that they told Dr. Schaefer about the incident on the fifteenth, when decedent had to be assisted back to his bed after experiencing difficulty breathing while being ambulated. Dr. Schaefer informed the Schiles

---

1. Pulmonary embolization occurs when pieces of a blood clot, known as emboli, break off and travel through the circulatory system, becoming trapped in the capillaries of the lung.

that if decedent began to hyperventilate again, he should breathe into a paper bag. Dr. Schaefer ordered a lung scan, a diagnostic test involving the induction of radioactive isotopes, and told the Schiles that decedent could be discharged if the lung scan results were normal. There is some dispute as to whether Dr. Schaefer ordered the lung scan as a precautionary measure or because he suspected pulmonary embolism.

Because decedent had recently undergone a gallium scan, which also involved radioactive isotopes, the full lung scan could not be performed. However, a recent chest x-ray is part of a lung scan, so chest x-rays were taken that afternoon. Ernst Radiology Clinic, Inc. provides radiological services for St. Joseph's Hospital, and the June 16 x-rays were examined by Dr. Savci of Ernst Radiology, who reported:

> a pneumonic process involving the right lower lobe [of the lung] at the posterior segments with minimal pleural reaction. There is slight decrease in the volume of the right lower lobe. The remaining right and left left [sic] lung fields are normal, normal cardiac size.

Dr. Savci testified at trial that he could not remember if he compared the 6/16 x-rays with the 6/11 x-rays, although he recognized that such comparison with prior films was good practice. He also agreed that significant changes were reflected in those sets of x-rays. Dr. Scheer, plaintiffs' radiology expert, characterized the 6/16 x-ray results as follows:

> The findings on that x-ray, to my mind, are those of a pulmonary embolus which has occurred and which has also resulted in a partial death of the one segment of the lung. That white patch is called an infarction, which means that that part of the lung is dying or had died because of the lack of blood supply there.

The x-ray report was filed with the hospital records, but Dr. Schaefer was not notified that x-rays had been taken or of the results. Dr. Schaefer testified that had he known what the x-ray findings were, he would have either kept decedent in the hospital or "ordered him back in for more tests." He further testified that he was unaware that a regular chest x-ray was part of a lung scan; however, he did not order a chest x-ray when he learned that the complete lung scan could not be done. Furthermore, Dr. Joseph testified that "every doctor in the world knows that you have to get a chest x-ray first before you get the lung scan." Decedent was subsequently discharged from the hospital at 3:00 p.m. on June 16, without the lung scan.

When decedent returned home he was limping and he started to experience pain in his left calf. The next morning his left leg began to swell. At the suggestion of a neighbor, the Schiles contacted Dr. Butsch about decedent's condition.

Dr. Butsch examined decedent in his office on June 18. Decedent's blood pressure was taken, a blood test was performed, and the swelling in his leg was measured. There is conflicting evidence as to what else transpired. Mrs. Schiles testified that Dr. Butsch told them that decedent probably had a small non-dangerous blood clot in the area of his knee, and that decedent should elevate his leg, wrap it in a warm towel, and "stay off it." She testified further that Dr. Butsch said "he could put [decedent] back in the hospital, but as far as he was concerned every test that he could think of had been run." Dr. Butsch testified that decedent was told he was seriously ill and should be in the hospital, but decedent refused to go, stating that "he had just gotten out of the hospital and they did all those [tests] and they can't find out what's wrong." Dr. Butsch also testified that decedent would not consent to a chest x-ray, which could have been performed at the doctor's office. Dr. Butsch said that he called Dr. Schaefer while the Schiles were in his office, but Dr. Schaefer was performing surgery at that time. Dr. Schaefer returned Dr. Butsch's call between 6:00 and 7:00 that evening. Dr. Schaefer testified that:

I do not remember all of the substance [of the telephone conversation], except that he told me that he had seen Mr. Schiles on that day, and that Mr. Schiles looked terrible and he thought he ought to be hospitalized. He told me that Mr. Schiles refused to go to the hospital and had refused to have an x-ray before two—I think women, I'm not sure, people who worked in his office at that time.

However, he also testified that Dr. Butsch did not indicate that this was a life-threatening situation.

Mrs. Schiles testified that after leaving Dr. Butsch's office she and decedent returned home, and decedent "stay[ed] completely off the leg. He elevated it, and wrapped it in a warm towel. He didn't even get up to eat." At about 1:00 a.m., decedent awoke screaming and breathless. Mrs. Schiles said that she went to get a paper bag for decedent to breath into, as Dr. Schaefer had recommended for hyperventilation. Decedent went into the bathroom, collapsed, and died from "an acute pulmonary embolus."

Pulmonary embolism is a common postoperative complication. During the immobolization of surgery, blood tends to settle and clot in the pelvic region. Pieces of the major clot, known as emboli, break off and travel through the circulatory system, often becoming lodged in the small blood vessels of the lung. When this occurs the portion of the lung beyond the clot is deprived of oxygen. About 25% of the time pulmonary embolism is fatal. The signs of pulmonary embolization include hemoptysis (coughing up blood), shortness of breath, and chest pain, particularly in post-operative patients; although there was conflicting expert testimony as to how "specific" these symptoms are for pulmonary embolism. Taken individually, each of these symptoms has a number of possible causes. Plaintiffs' theory was that had pulmonary embolism been properly diagnosed, and had heparin, an anticoagulant, been administered to decedent in timely fashion, he would not have died.

On appeal, all three defendants contend that plaintiffs failed to prove causation; and point to testimony elicited from plaintiffs' expert, Dr. O'Brian, on cross-examination to the effect that there will be a 25% incidence of embolization when the patient is given heparin therapy. In a closely related point, defendants contend that Dr. O'Brian's opinion that decedent would not have died if heparin treatment had been instituted was based on speculation and should have been excluded.

On direct examination, Dr. O'Brian testified that it was his opinion that "had Heparin been administered to the patient in a timely fashion, he would not have sustained fatal pulmonary embolization." He further testified that:

> Given the fact that institution of Heparin therapy *immediately reduces the risk of [embolization] by over 75 percent,* I would have to say yes, it is my opinion, based upon a reasonable degree of medical certainty, that had Heparinization been instituted *at any time prior to a fatal pulmonary embolization occurring,* that that pulmonary embolus with any degree with all medical certainty would not occur, or would not have occurred. (emphasis ours).

Dr. Joseph, another of plaintiffs' expert witnesses, testified that "... having been anticoagulated, I can say within a reasonable degree of medical probability that in the case of anticoagulation, the man would not have suffered a saddle embolus." Both doctors testified that heparin prevents the formation of new clots and the dissemination, or breaking off, of existing ones; however, it does not dissolve existing clots. The body itself produces enzymes which dissolve clots, a process which takes about three days.

Several portions of Dr. O'Brian's testimony on cross-examination are relevant. Counsel for Dr. Schaefer, after asking what percentage of people who suffer pulmonary embolization die, inquired further:

> Q. All right. So 25 percent of them die anyway, correct?

A. Well, this—no. No, that's wrong. Because that would imply that 25 percent of the people were going to die, no matter what they did. The vast majority of pulmonary embolizations probably happen outside the hospital setting.

\* \* \* \* \* \*

Q. All right. And are you aware of the fact that of those people we're talking about, 13,000 of them who have been given Heparin therapy still die?

A. I would say that that's, in all probability, not true.

Counsel for Dr. Butsch asked:

Q. Isn't it a fact, Doctor, that Mr. Schiles could have had Heparin—He could have gone directly from Dr. Butsch's office to the hospital, they could have immediately started him on Heparin, and he could have still had the fatal clot in his body already that eventually was the cause of his demise; isn't that a fact?

A. No. I don't feel it to be a likely factor. And perhaps I didn't make myself clear when I was giving my presentation.

I pointed out the fact that the clot that existed in his vena system has at its edges, some material which prone [sic] to break off and travel elsewhere. These are called emboli. The clot that he had in his vena system was present probably since the time of surgery, and was causing a small pulmonary emboli to occur.

The fatal clot that you're referring to could have been the last piece of it that broke off. It was continually present from the beginning. But we know that once we given [sic] Heparin, we reduce the incidence of these things breaking off by over 50 percent, probably closer to 75 percent. So that they're 75 percent less likely to have a fatal clot or any clot or any piece of a clot break off and travel to the lungs after you start them on Heparin.

\* \* \* \* \* \*

Q. Okay. So even with the immediate institution of Heparin, we could have ended up with the same result that we have today; isn't that correct?

A. Yes, but not as likely.

Finally, on recross-examination by defense counsel for Dr. Schaefer, Dr. O'Brian was asked:

Q. So then even under your testimony here, had Mr. Schiles been given—been rehospitalized and given Heparin, there was still a 25 percent chance that he'd die?

A. Let me state what I feel the facts again [sic], just as—I think I understand your question. I assure you I'm not willing to—I'm not wishing to be unreasonable.

There's a 75 percent decrease in the incidence of pulmonary embolization. There is a 75 percent incidence of—incidence of fatal pulmonary embolization. And my exact knowledge was that if you had four out of four chances of having a fatal pulmonary embolism before, you now have a one out of four of [sic] chance.

But that presumes you know who is going to die with a pulmonary embolism. So the only thing I can tell you is it will decrease the incidence of embolization by 75 percent. But there will be 25 percent incidence even on Heparin therapy.

Q. All right. So that would it be fair to say that even had—even under your theory and under your criticism, that had Mr. Schiles been given Heparin, there still is a 25 percent chance he was going to die?

A. *That he would have had a pulmonary embolus. I don't know whether it would have been fatal. It may have been a smaller embolus due to the effect of Heparin therapy.*

Q. Do you know what the percentage is, if he had been given Heparin as you've indicated; *do you know how much better chance, in terms of a definite percentage he would have had of surviving?*

A. Of survival?

Q. Right.

A. I would assume from the general statistics that he would have had a 75 percent better chance of survival.

The clear import of Dr. O'Brian's testimony is that heparin treatment reduces the incidence of embolization by 75%, and may reduce the incidence of *fatal* pulmonary embolization even further because it can decrease the size of the emboli.

■ We find the testimony of Dr. O'Brian and Dr. Joseph sufficient to make a submissible case against all three defendants on the issue of causation; the percentages referred to by Dr. O'Brian go solely to the weight to be given his testimony. The instant case is similar to *Bertram v. Wunning*, 417 S.W.2d 120 (Mo.App.1967) [*Bertram* II]. At the second trial of that case, the doctor testified on direct examination that plaintiff's injuries were, within a reasonable degree of medical certainty, caused by the automobile collision in dispute. On cross-examination the following exchange ensued:

Q. Doctor, did you just testify a few minutes ago before this Court under oath, without the aid of a Jury, that in your opinion that you were basing this on a 90–10 percentage the same as you did in the other trial? A. To me that's reasonable medical certainty. Yes, Sir. Q. And you are basing your answer of reasonable medical certainty on a 90–10 percentage? A. No. *My reasonable medical certainty is a 90–10* percentage. You have it reversed.

*Id.* at 124.

This court held that:

In the instant case [the doctor's] reply to the hypothetical question as to causal connection was not couched in terms of "could be" or "I couldn't say" but was a definite affirmance that within "reasonable medical certainty" his opinion was the accident caused the hernia. What the phrase "reasonable medical certainty" meant to Dr. Niesen is a matter going solely to the weight to be given his testimony and not to whether such testimony constitutes sufficient evidence of a

causal connection between the hernia and the accident.

*Id.* at 125.

Here, too, an unequivocal opinion was given by Dr. O'Brian and was not withdrawn, despite determined cross-examination. The percentages referred to did not vitiate his expert opinion. The testimony in this case went beyond percentages, and included unequivocal expert opinions. It can therefore also be distinguished from *Kimmie v. Terminal R.R. Ass'n of St. Louis*, 354 Mo. 596, 66 S.W.2d 561 (1933) and *James v. Sunshine Biscuits, Inc.*, 402 S.W.2d 364 (Mo.1966), cited by defendants. Furthermore, Dr. O'Brian's testimony was not speculative. It was not couched in terms of possibilities; it was instead expressed clearly in terms of *reasonable* medical certainty. The fact that statistics were cited indicates that Dr. O'Brian *did* have a scientific basis for his opinion, and his admission that decedent might have died with heparin therapy establishes merely that his opinion was based on *reasonable, not absolute medical certainty.* Defendants' points are denied.

■ We note Dr. Schaefer also contends that:

The court erred when it permitted Dr. O'Brian to testify that Dr. Schaefer violated the standard of care because the facts posed in the hypothetical questions included facts contrary to the medical records; and the facts posed in the hypothetical questions assumed that Dr. Schaefer knew of the June 16, 1981, x-ray.

Defense counsel made no objection to the inclusion of "facts contrary to the medical records" at trial, and has not properly preserved that point for review. Furthermore, this contention ignores the facts testified to by Mrs. Schiles. We also find no merit in Dr. Schaefer's argument that the hypothetical assumed he knew of the June 16, 1981, x-ray. The hypothetical posited that "Dr. Schaefer *did not order any additional x-ray,* [and] did not make an effort to see what x-ray revealed (sic) as a part of the lung scan ..." It does not ask Dr.

O'Brian to assume that Dr. Schaefer knew of the x-ray; indeed, ordering an additional x-ray would have been unnecessary if Dr. Schaefer knew that one was taken as part of the scan. We also note that plaintiffs' counsel subsequently asked Dr. O'Brian to assume that Dr. Schaefer "didn't know that an x-ray was taken as part of a routine lung scan ...", to which Dr. O'Brian responded that ordering "an additional chest x-ray would be appropriate" in that situation.

■ Dr. Schaefer and Dr. Butsch further contend that the court erred in permitting plaintiffs to read from the deposition of Dr. Joseph answers to questions asked by defense counsel regarding what criticism Dr. Joseph had of Dr. Schaefer's and Dr. Butsch's treatment of decedent because the questions and responses were not framed in terms of "reasonable medical certainty."

We initially point out that Rule 57.-07(a)(3) permits the deposition of any witness who is not present in court to be used for any purpose when the witness resides out of state. Dr. Joseph testified that he resided in Gaithersburg, Maryland, so plaintiffs' use of his deposition at trial was in accordance with Rule 57.07.

We turn now to defendants' specific contention regarding the admissibility of Dr. Joseph's testimony. Dr. Joseph was examined by all defense counsel, and no defendant raised any complaint as to the questions asked by the others; nor was any objection made to the responses elicited. Rule 57.97(d)(3) provides:

*As to Taking of Deposition.* (A) Objections to the competency of a witness or to the competency, *relevancy, or materiality of testimony* are not waived by failure to make them before or during the taking of the deposition, unless the ground of the objection is one which might have been obviated or removed if presented at that time. (B) Errors and irregularities occurring at the oral examination in the manner of taking the deposition, *in the form of the questions or answers*, in the oath or affirmation, or in the conduct of parties and errors of any kind which might be obviated, removed, or cured if promptly presented, *are waived unless seasonable objection thereto is made at the taking of the deposition.* (emphasis ours).

Dr. Schaefer and Dr. Butsch, by failing to object to questions asked by others or raise any timely complaint regarding Dr. Joseph's responses to their own questions, clearly waived their present objections, which assert defects that could have been easily obviated.

In addition, "reasonable medical certainty" is not a mandated "verbal password" in questions propounded to an expert witness. *Miller v. Weber*, 688 S.W.2d 389, 391 (Mo. App.1985). The trial court is vested with substantial discretion in the admission of expert testimony, and our examination of the record reveals no abuse of that discretion here. *Id.*

All three defendants also argue that the verdict directing instructions pertaining to them were erroneous. Plaintiffs' verdict director regarding Dr. Schaefer, Instruction No. 7, reads as follows:

Your verdict must be for plaintiffs against defendant Schaeffer if you believe:

First, plaintiffs were the wife, children and mother, respectively, of decedent James Schiles, and

Second, either:

defendant Schaeffer failed to keep James Schiles in the hospital and institute heparin treatment, or

defendant Schaeffer failed to timely determine the results of the June 16, 1981, chest x-ray, or

defendant Schaeffer failed to obtain a chest x-ray on the day of and prior to discharge, and

Third, defendant Schaeffer, in any one or more of the respects submitted in paragraph Second was thereby negligent, and

Fourth, such negligence directly caused or directly contributed to cause the death of James Schiles.

In accordance with MAI 3rd 11.06 and 11.-08, the jury was further instructed that:

The term "negligent" or "negligence" as applied to a health care provider means the failure to use that degree of skill and learning ordinarily used under the same or similar circumstances by the members of that health care provider's profession.

■ Dr. Schaefer first contends that Instruction No. 7 assumes a controverted fact in that the instruction "did not leave the jurors with an option to determine whether Dr. Schaefer knew or should have known an x-ray was performed." Specifically, Dr. Schaefer points to the language in paragraph second hypothesizing a failure to "timely determine the results of the June 16, 1981, chest x-ray."

While the general principle is that an instruction assuming controverted facts is erroneous, the facts of each case must be examined. *Welch v. Hyatt*, 578 S.W.2d 905, 913–914 (Mo. banc 1979). "If close scrutiny of the instruction demonstrates that it is calculated to lead the jury to believe assumed disputed facts the instruction suffers from the infirmity of the principle." *Id.*

We do not agree that Instruction No. 7 improperly assumes a controverted fact. No evidence was introduced which indicated that Dr. Schaefer *did* "timely determine" the x-ray results, the only fact hypothesized in the disputed portion of the instruction. As we have previously noted, plaintiffs' evidence indicated that Dr. Schaefer should have known that a lung scan includes regular chest x-rays. While Dr. Schaefer adduced evidence that reasonably competent surgeons might be unaware that regular chest x-rays are taken in connection with a lung scan, such evidence goes to the question of Dr. Schaefer's negligence in not determining the x-ray results prior to releasing decedent. Whether or not Dr. Schaefer knew or should have known an x-ray was taken was a question for the jury to resolve in connection with Dr. Schaefer's "negligence." The jury could have found, under the submitted instruction, that Dr. Schaefer failed to determine the results of the x-ray, but that he was not negligent in that regard because

he neither knew nor should have known that the x-rays were taken.

Dr. Schaefer's reliance on *Yoos v. Jewish Hospital of St. Louis*, 645 S.W.2d 177 (Mo. App.1982), is misplaced. There the challenged instruction read in pertinent part as follows:

First, defendant's employee administered a spinal anesthetic which was permitted to spread too high to the nipple line.

*Id.* at 192. The court noted that "the paragraph unlawfully removes from the jury the factual question whether here the nipple line is 'too high' for a spinal", and found the paragraph to be prejudicially ambiguous because the jury might believe that the instruction defined the nipple line as an impermissibly high level for a spinal anesthetic. *Id.* In this case there is no such ambiguity, and as we have noted, the question of whether Dr. Schaefer knew or should have known that an x-ray was taken as part of a lung scan was not removed from the jury.

■ Dr. Schaefer further contends that Instruction No. 7, which hypothesizes failure "to obtain a chest x-ray on the day of and prior to discharge", thereby submitted a theory of negligence that was outside of the pleadings.

While instructions must be within the general scope of the pleadings, an instruction need not follow the language of the petition. *Keaton v. Good*, 350 S.W.2d 119, 125 (Mo.App.1961). "It is sufficient if it falls within the fair implication or 'within the purview' of the petition, its 'legal intendment', or what it 'inferentially charges' ..." (citations omitted). *Id.* Plaintiffs' second amended petition stated, in pertinent part, that:

Defendant Schaeffer *failed and omitted to rule out* pulmonary embolism in decedent before allowing him to be discharged.... Defendant Schaeffer negligently *failed and omitted to timely diagnose* pulmonary embolis.... (emphasis added).

We believe that "failure to obtain an x-ray" falls within the fair implication of failure to diagnose or "rule out" pulmonary embolism. The evidence clearly established that a chest x-ray is an important diagnostic tool in regard to pulmonary embolism. Furthermore, the instruction was actually narrower than the pleading, in that it focused on one aspect of Dr. Schaefer's failure to diagnose pulmonary embolism. In addition, Dr. Schaefer's failure to obtain a chest x-ray before discharging decedent was an important issue both during discovery and at trial, so the instruction did not raise an unexpected question. Dr. Schaefer's points are without merit.

■ Dr. Butsch contends that Instruction No. 11, plaintiffs' verdict director against him, was not supported by the evidence. Instruction No. 11 reads as follows:

Your verdict must be for plaintiffs against defendant Butsch and you must assess a percentage of fault to defendant Butsch if you believe:

First, plaintiffs were the wife, children and mother, respectively, of decedent James Schiles, and

Second, defendant Butsch failed to adequately advise James Schiles of the necessity for hospitalization *and heparin treatment,* and

Third, defendant Butsch was thereby negligent, and

Fourth, such negligence directly caused or directly contributed to cause the death of James Schiles. (emphasis ours).

Dr. Butsch alleges that "there was absolutely no evidence at trial which supports the proposition that Dr. Butsch should have advised James Schiles of the necessity of heparin treatment."

We disagree. Dr. O'Brian testified that Dr. Butsch should have diagnosed thrombophlebitis (inflamation of the veins associated with blood clots) when decedent visited his office on June 18, and further said "a patient with that constellation of symptoms and signs should have been immediately readmitted to the hospital for the institution of Heparin to occur." Dr. Joseph tes-

tified that Dr. Butsch "should have done whatever was necessary to treat the thrombophlebitis and *evaluate and instruct proper treatment.*" Dr. Butsch's own expert, Dr. Ortbals, testified on cross-examination that:

It's hard for me to judge whether Dr. Butsch recommended [hospitalization] strongly or not strongly. I would indicate—I would think if he suspected the deep venous phlebitis, he would have been more adamant in his insistence on the individual going into the hospital, yes.

Q. And if a patient presented himself to you with the kind of symptoms this man had, I presume that you're looking at it and your interpretation of his condition, you would have recommended in the most strong terms possible that he get into the hospital; would you not, sir?

A. Yes, I would have.

Q. And I presume that you would have done it in terms such as you have—" Sit down. You have got to get to the hospital. This can kill you." Words along that effect, sir?

A. It's possible I might have used those terms, yes.

Thus the experts agreed that hospitalization should have been forcefully recommended. The "strongest terms possible" in recommending hospitalization included an explanation to decedent that he needed to be hospitalized for heparin treatment and observation. Such an interpretation becomes all the more logical when Dr. Butsch's testimony is considered. If, as he testified, decedent refused to enter the hospital for tests "that had already been done", Dr. Butsch should have explained that decedent needed medication which could only be administered in a hospital setting, not just diagnostic procedures. In light of the evidence indicating that decedent should have been hospitalized so that heparin therapy could be instituted, and that Dr. Butsch should have impressed upon decedent the seriousness of his condition as well as the necessity of hospitalization, we believe a jury issue existed as to

whether Dr. Butsch "failed to adequately advise [decedent] of the necessity for hospitalization and heparin treatment."

▇▇▇ Defendant Ernst Radiology contends that Instruction No. 9, plaintiff's verdict director against it, was "misleading, ambiguous and indefinite and constitutes a roving commission to the jury." [2] Instruction No. 9 reads as follows:

Your verdict must be for plaintiffs against defendant Ernst Radiology, Inc., and you must assess a percentage of fault to defendant Ernst Radiology, Inc., if you believe:

First, plaintiffs were the wife, children and mother, respectively, of decedent James Schiles, and

Second, defendant Ernst Radiology failed to timely communicate the results of the June 16, 1981, chest x-ray to Dr. Schaeffer, and

Third, defendant Ernst Radiology was thereby negligent, and

Fourth, such negligence directly caused or directly contributed to cause the death of James Schiles.

Ernst contends that the instruction is ambiguous and constitutes a "roving commission" because it "fails to require the jury to determine [the] essential, contested factual issue [of] ... whether the results of the June 16, 1981, chest x-ray were or were not life-threatening" and "because it combines at least three specific theories of negligence into a general submission."

A proper instruction submits to the jury only ultimate issues, not evidentiary details, in order to avoid undue emphasis of certain evidence, confusion, and the danger of favoring one party over another. *George v. Gross and Janes Co.*, 634 S.W.2d 579, 582 (Mo.App.1982). As we observed in *Grindstaff v. Tygett*, 655 S.W.2d 70, 73 (Mo.App.1983):

Admittedly, our courts have been unable to fashion precise, universally applicable definitions which explicitly differentiate evidentiary facts from ultimate facts and, thus, on a case by case basis, we determine 'what [are the ultimate facts] which must be submitted in a verdict directing instruction and what are evidentiary facts which, in detailed fashion, are not to be included.' (citations omitted).

Cognizant of these principles, we examine Ernst's contentions. Dr. Scheer, a radiologist, testified as an expert witness for plaintiff. The following exchange occurred on direct examination:

Q. Do you have an opinion, based on reasonable medical certainty, as to whether or not there was a failure to exercise that degree of care which is customarily exercised by radiology personnel in connection with transmitting the information to either the patient or the doctor that is seen on this film?

A. Yes, I have an opinion that just the same as you found a fracture or a partial lung collapse or—and a big blood vessel was about ready to rupture, and this is considered to be an emergent condition, and because of that, it's the radiologist's responsibility, in my opinion, to seek the physician who ordered the study and make sure that he is aware of what is going on.

Q. All right. And in your opinion, if the radiologist did not, or the department did not communicate the findings of these films to the treating doctor, would that, in your opinion, be a failure to exercise due care under the circumstances?

A. In my opinion, I believe it's substandard care.

As Ernst acknowledges in its brief, "plaintiffs' theory against Ernst was a failure to communicate immediately with Dr.

---

**2.** Although Ernst now argues that "the instruction submits a general theory of negligence, containing at least three specific theories of negligence, *none of which ... are supported by the evidence*", this specific objection was not made at trial or in Ernst's post-trial motions.

Therefore, the question of whether a submissible case was made in connection with Ernst's negligence was not preserved for review. Furthermore, the testimony of plaintiff's radiology expert, Dr. Scheer, clearly constituted sufficient evidence of Ernst's negligence.

Schaeffer." Dr. Scheer's testimony supports plaintiffs' theory, and Instruction No. 9 simply and accurately reflects it. Ernst in effect argues that plaintiffs were required to postulate a theory of misdiagnosis; however, plaintiffs had the right to choose any theory that was supported by the evidence. *Cignetti v. Camel*, 692 S.W.2d 329, 338 (Mo.App.1985). Whether the x-rays revealed an emergency situation was an evidentiary detail encompassed within the ultimate issue of whether Ernst was negligent in failing to immediately contact Dr. Schaefer after the x-ray results were ascertained. The jury was faced with a simple choice: to believe Dr. Scheer's testimony that failure to immediately communicate the x-ray findings was substandard care, or to believe the defendants' evidence indicating that the x-rays were not indicative of a life-threatening condition and that Ernst therefore acted reasonably. We conclude that the instruction was unambiguous and comprehensible to a jury of ordinary people.

The language of Instruction No. 9 is very similar to that of the verdict director in *Cignetti*. 692 S.W.2d at 338. There the instruction hypothesized that "defendant failed to perform a timely Caesarian section." The court stated:

Defendant's attack focuses on the language in the verdict directors, "failed to perform a timely Caesarean section," and particularly the word "timely." He contends that because no "timely" operation was performed, in the sense that it prevented a rupture, the instructions allowed the jury to impose liability simply because of the failure to operate. A proper submission, he contends, would have been that he failed to adequately consider the risk of uterine rupture. The submission would leave the decision to operate in the field of medical judgment.

Defendant's argument misconstrues plaintiffs' theory. That theory, supported by Dr. Kapstrom's testimony, was that the failure to perform the Caesarean section was negligent. From Dr. Kapstrom's testimony, the jury could find that medical judgment left no room for a decision not to operate. Thus, contrary to defendant's contention, he had an absolute duty to perform a Caesarean section, because exercise of the degree of skill and learning ordinarily used by members of his profession would allow him to make no other decision.

*Id.* Here Dr. Scheer's testimony indicated that medical judgment left no room for any decision other than to immediately communicate the x-ray results to Dr. Schaefer.

As should be clear from the above discussion, plaintiffs' verdict director submitted one theory of negligence in regard to Ernst: failure to immediately communicate the x-ray results. Ernst's argument that more than one theory of negligence was submitted is incorrect, and its reliance on *Grindstaff, supra,* is misplaced. 655 S.W.2d at 70. There the court found the instruction, which hypothesized that "defendant performed a midforceps rotation when such procedure was not medically proper", contained "at least two more specific theories of negligence: (1) defendant should not have started the procedure, or, (2) starting the procedure was proper but, once started, defendant should have stopped." *Id.* at 73. The court held that:

plaintiffs failed to submit sufficient ultimate facts so as to make it clear to the jury what facts it must find in order to return a verdict against defendant. As a result, the verdict directing instructions fail to give the jury any real direction; rather, these instructions give the jury a 'roving commission' to speculate and determine on its own why and in what manner the midforceps rotation procedure was 'not medically proper'.

*Id.* at 74. Instruction No. 9 in the case at bar did give the jury direction, and submitted only the theory of negligence reflected in Dr. Scheer's testimony. As was noted in *Grindstaff*, the ultimate facts must be determined on a case by case basis, and our examination of the record before us leads to the conclusion that plaintiffs submitted sufficient ultimate facts in Instruction No. 9. *Id.* at 73.

■ Some final issues regarding the instructions should be briefly addressed. First, defendant Schaefer contends that Instruction No. 5, containing a definition of negligence, was an improper deviation from MAI 3rd 11.06 and that the term "health care provider" should also have been defined.[3] We find no merit in these arguments. Because decedent's comparative negligence injected more than one standard of care into the case, MAI 11.06 was properly modified by MAI 11.08. In addition, "health care provider" was unambiguous and needed no further explanation.

■ Second, all defendants claim that the verdict directors against them were improperly modified by MAI 3rd 19.01 in regard to causation. Paragraph four of plaintiffs' verdict directors hypothesized that: "such negligence caused or directly contributed to cause the death of James Schiles." Defendants contend that they were successive rather than joint tortfeasors, thus making 19.01 inapplicable. We disagree. It is clear that "where the concurrent *or* successive negligence of two persons, combined together, results in an injury to a third person, he may recover damages of either or both and neither can interpose the defense that the prior or concurrent negligence of the other contributed to the injury." (citations omitted) (emphasis added). *Glick v. Ballentine Produce Inc.*, 396 S.W.2d 609, 612 (Mo.1965). Defendants' contention that they are not jointly liable for the single, indivisible injury to decedent is absolutely devoid of merit. Defendants' further contention that 19.01 was inapplicable because "contributory negligence" is an issue totally ignores the adoption of comparative negligence in Missouri. *Gustafson v. Benda*, 661 S.W.2d 11 (Mo. banc 1983). We find no error in any of the submitted instructions.

Another principal contention of defendants is that the court erred when it denied defendants' motion for new trial in that they "did not receive a fair and impartial trial because Jurors Ware and Irving failed to disclose on voir dire prior suits in which they were parties."

During voir dire plaintiffs' counsel stated:

Let me ask, folks, there's a thing called a lawsuit. That usually means somebody goes down and files a paper in court. Then there's a claim. That means somebody says they have an action or claim against you. Those are two different kinds of situations. But I want to address both of them because they're both important to both sides of this lawsuit.

We really want to know if any of you folks—I don't care about domestic relations, I don't care about divorces and things like that. I don't care about collections where Famous Barr might have dunned me or you or any of us for a bill or things like that. What I do care about is any kind of claim or lawsuit where anybody got hurt or claimed to have been hurt.

Plaintiffs' counsel remarked further:

... I hate to dwell on this, folks, but I can't impress on you the significance of it. There's nothing in the world worse than getting a verdict and having them run downstairs, check the records and say, Hey, juror Jones forgot to tell you about his broken thumb he had in Oregon 12 years ago. And, you know, juries can be—or verdicts can be upset either way by failure to disclose. And sometimes it can get silly, but it can be done. This is the reason I'm dwelling on this subject more than I ordinarily would. Is there anyone then—I'm mentioned generally with respect to you folks, let me enlarge the question, and ask whether or not any member of your family has ever had a lawsuit or claim brought against him or her.

---

**3.** Instruction No. 5, as given by the court, reads as follows:

The term "negligent" or "negligence" as applied to a health care provider means the failure to use that degree of skill and learning ordinarily used under the same or similar circumstances by the members of that health care provider's profession.

Counsel for Dr. Schaefer made the following inquiry on voir dire:

> ... Has any one of you or any member of your immediate family ever had *an unpleasant experience with a medical person, a doctor, or a hospital? What you would call a bad or poor experience with them, where you had a falling out with the doctor, where you were sued over a bill, where you went to a doctor for a condition and the condition didn't get any better?* That's the sort of thing I'm talking about. Anybody ever have an experience like that in their life, or any member of your immediate family ever have such an experience? And by that I mean your spouse or your child, or your parent, living under the same roof. (emphasis ours).

Counsel made it clear that the inquiry in these areas went to suits by the juror, his spouse, and children or relatives living under the same roof.

Juror Vernell Irving stated in response to these questions that his wife had been involved in an automobile accident "six years ago", and had obtained an attorney, but Mr. Irving didn't think there was any claim. He further stated that he was employed by General Electric as a machinist, and his wife worked for the St. Louis Board of Education as a teacher. Mrs. Ware's responses on voir dire indicated that she was employed at City Hospital Number One. When asked if she was married she said she didn't know whether her husband was living or dead. She further indicated that she had three daughters, a son ᐧand three grandchildren. Both responded that they would listen to the evidence and follow the instructions.

Defendants alleged in their motion for new trial that Jurors Irving and Ware intentionally concealed information on voir dire. They claimed Mr. Irving failed to disclose that he had been sued in 1978 by St. Louis Christian Medical Center, and that Mrs. Ware did not reveal that she had a personal injury suit pending.

At the post-trial hearing on defendants' motion the court took judicial notice of *St.*

*Louis Christian Medical Center v. Vernell Irving and Dizonia Irving,* No. 63777G (Circuit Court of the City of St. Louis). That suit was brought by St. Louis Christian to recover $1,058.31 on a hospital bill incurred in April 1976 as a result of a tubal ligation performed on Mr. Irving's wife, Dizonia. The Return on Service completed by the sheriff indicates that Mr. Irving was served with a summons on September 17, 1978. A third party petition against Golden Rule Insurance Company was filed on behalf of the Irvings, in which they admitted owing the hospital, but averred that Dizonia Irving's insurance policy, obtained through her employment with the St. Louis Board of Education, covered the medical services performed by St. Louis Christian. The third party claim was severed, and summary judgment was entered in favor of St. Louis Christian on its claim against the Irvings on July 27, 1982. All attempts to execute the judgment were apparently directed towards Dizonia Irving, and her wages were garnished in 1983.

Mr. Irving testified at the post-trial hearing that he understood all the voir dire questions, but had not mentioned the St. Louis Christian suit because he was unaware of it at the time of trial. He said he had not been served, did not know that a lawyer had been hired, and was unaware that his wife's wages had been garnished. He explained that she handled the bills. He stated that he knew his wife had had her "tubes tied," but was unaware that the medical bill thus incurred was not paid. Mr. Irving testified further that he had an eleventh grade education.

Mrs. Irving testified at the hearing on behalf of plaintiffs. She said she had been a teacher for 17 years, and was employed by the St. Louis Board of Education, which at that time had a group insurance plan with Golden Rule Insurance. She explained that a dispute arose between her and Golden Rule as to whether the tubal ligation at St. Louis Christian was covered by the insurance policy. She said she never told her husband about the suit, judgment or garnishment because she wanted

him to have a good opinion of her, and stated: "he was unaware of it because I planned it that way." She hired a lawyer, without informing her husband, and "took care of these matters [herself]." She testified further that the mail concerning the lawsuit came in her name and she made sure that "[she] got it and [her] husband didn't." She showed the court letters from her attorney addressed to her alone. She also testified that she believed she was served with the summons, but had no direct recollection of it; although she stated that she would have known if her husband was served "because there would have been a great explosion." On cross-examination she testified as follows:

I'm not saying that he didn't know about the hospital bill from the beginning. I never said that. But as far as did I discuss getting the lawyer and all that with him, no.

Q. Did you tell him—well, did you ever tell him that you'd been sued.

A. Did I tell him I was sued?

Q. Yes, ma'am.

A. No.

Q. So you're saying that even though you got served with these papers and there was this lawsuit pending against you, you never once mentioned it with your husband in the 4½ years before you were garnished?

A. No.

Q. And when your wages got garnished, you never told your husband that?

A. *No, I went to special effort to make sure that he didn't know.* (emphasis ours).

The court also took judicial notice of *Ware, et al. v. Brunner, et al., No. 51294F* (Circuit Court of the City of St. Louis), a personal injury suit which was filed in May 1975 and is apparently still pending. That suit resulted from an automobile accident in which juror Ware was involved as a passenger, and one of the defendants is her daughter, Rosetta Brunner.

Mrs. Ware testified at the motion hearing that she knew she was in an automobile accident in 1974, but could not remember specifically where it occurred. When asked if she received any injuries, she stated: "well, I know I had a—the impact, it—well, it did something to my 'nakel' [ankle?]...." She further testified that subsequent to the accident she went to St. Luke's Hospital, where x-rays were taken. The accident occurred in Mrs. Ware's car, which her daughter was driving, and the passengers included, besides Mrs. Ware, her two sisters and her son. Although she is named as a plaintiff in the suit, Mrs. Ware testified that she never hired or contacted a lawyer, and was unaware that a suit had been filed on her behalf. When asked whether she was aware of the pending lawsuit, Mrs. Ware stated:

A. I didn't know about that,—

Q. You don't know anything about it?

A. —but I know my sister got a lawyer. But I had nothing to do with it. I never talked to him.

Q. All right. And you never signed any contract of any kind?

A. No, I didn't sign anything. I haven't signed anything.

The record revealed that Walter Floyd was the attorney for plaintiffs in that 1975 suit. On cross-examination, Mrs. Ware stated that she remembered receiving a letter from a Walter Floyd, but said she had not talked to him in person or on the phone.

During the hearing, Mrs. Ware volunteered information regarding two other incidents. She said that when she was doing "domestic work" for a lawyer's wife many years ago, she was bitten by a dog and filed suit to recover damages. The suit apparently was settled out of court, and Mrs. Ware recovered "about seven fifty." She also recalled that her daughter was struck by a car 16–18 years ago. She said that she and her husband were not living with each other then, and that he hired a lawyer to represent their daughter. Mrs. Ware testified that she "had nothing to do with it," and could remember no details except that her daughter received

some money. Mrs. Ware testified that she understood the questions posed during voir dire, but had not mentioned the automobile accident or the other two incidents because "it had been so long" that she had forgotten about them.

To resolve the question of whether these jurors' failure to disclose information regarding prior claims on voir dire amounted to intentional concealment, we examine previous pronouncements of Missouri Courts on the subject. We first consider *Beggs v. Universal C.I.T. Credit Corporation*, 387 S.W.2d 499 (Mo. banc 1965). The relevant voir dire question in that case, posed to each jury panel member individually, was: "Have you ever had any trouble with any finance company?" Three jurors who responded in the negative were later found to have been involved in lawsuits or repossessions by finance companies. At the post-trial hearing on defendant's motion for new trial, all three jurors admitted being aware of those incidents at the time of trial. A fourth juror did not respond when the entire panel was asked if any of them had ever been a party to a lawsuit. He testified at the hearing that two years prior to the *Beggs* trial he had filed a $50,000 personal injury suit which was settled a few months thereafter for $4,500. He conceded that he had remembered that suit during voir dire questioning, but did not disclose it because he did not feel it had anything to do with the case being tried.

The Supreme Court stated:

A juror's intentional concealment of a material fact *may* require the granting of a new trial. For bias and prejudice on the part of a juror may be inferred from his intentional concealment of such information. In the final analysis, therefore, the question of what result should follow the failure of a juror to correctly answer a question touching his qualifications depends upon whether or not he was guilty of an intentional concealment. Primarily, the determination of that question must be left to the sound discretion of the trial court. Nevertheless, the exercise of such a discretion is subject to judicial review, and if an appellate court concludes from the record that an abuse of discretion unmistakably appears, it is its duty to reverse the ruling. (citations omitted) (emphasis ours).

*Id.* at 503. The Court held:

A review of the evidence in this case has convinced us that the jurors in question wilfully and intentionally withheld information which should have been disclosed on voir dire examination. That being true, the defendant sustained prejudice in that it did not have a trial before a fair and impartial jury of twelve persons and we therefore rule that the trial court abused its discretion in overruling the motion for new trial.

*Id.* at 504.

In *Goodman v. Firmin Desloge Hospital*, 540 S.W.2d 907 (Mo.App.1976), after a verdict for defendant in a malpractice suit, it was discovered that one of the jurors failed to disclose on voir dire her prior involvement as a defendant in a personal injury action. The automobile accident which was the subject of that earlier suit occurred in 1960, sixteen years prior to the date of the *Goodman* opinion. The case was tried in Magistrate Court in 1961, and, after an appeal to the Circuit Court, was tried by a jury on November 20, 1962. At the post-trial hearing the juror testified that she had forgotten about the earlier accident until called after the *Goodman* trial. At the hearing she remembered the jury trial and that judgment had been entered against her; however, she was vague about some of the details "because her husband took care of those." *Id.* at 911. She further denied any intention to conceal information regarding the accident. Relying on the standard of review established in *Beggs,* we concluded "that the trial court did not abuse its discretion under the facts developed at [the] post-trial evidentiary hearing." *Id.* at 910.

In *Marshall v. Brown*, 608 S.W.2d 105 (Mo.App.1980), the prospective jurors were

asked if any of them had ever "made a claim" asking for money.[4] During voir dire juror Nickel responded that she had been involved in an automobile accident, and that "the insurance company took care of both cars." She further stated that she did not go to the hospital after the accident, but was treated by a doctor for two broken ribs. She contacted the other party's insurance agent about her injuries, and was informed that "they didn't pay off for anything like that." When asked if she requested a settlement from them, she replied "No." At the post-trial hearing on defendant's motion for new trial, Mrs. Nickel testified that she did not recall filling out forms or any contact with the other party's insurer other than the one time she mentioned on voir dire. However, Stephen Finney, an adjuster with the insurer, testified that he had "a number of conversations" with Mrs. Nickel concerning the matter, and kept her file open longer than usual because she had been so "adamant" about her right to recover. *Id.* at 110. The post-trial record also contained a Report of Accident, which Mrs. Nickel had signed, that included a claim for medical costs.

In reversing the trial court's denial of defendant's motion for new trial, this court held:

> We think it reasonable to infer from Mrs. Nickel's attempted explanation a belief on her part that, since she received full compensation from her own insurance company, she was not a disgruntled, unsuccessful claimant likely to be biased. A venireman, however, is not the proper judge of his or her qualifications to sit as a juror. *Beggs,* supra, 503. Giving deference, as we must, to the trial court's ability to observe the attitude and demeanor of Mrs. Nickel at the hearing, we nonetheless do not think that she offered credible or sufficient explanations for

her concededly incorrect responses on voir dire.

*Id.* at 111.

*Anderson v. Burlington Northern Railroad Co.,* 651 S.W.2d 176 (Mo.App.1983) is another case in which this court dealt with the issue of failure to disclose information on voir dire. There the panel was asked if "any of you or your immediate family had been a party to a lawsuit." The panel member who later became jury foreman did not respond. At the hearing on defendant's motion for new trial he testified that five years earlier his brother had sustained facial injuries in an automobile accident, and after a three day trial his brother and parents recovered damages of $20,000. The foreman said he remembered the incident, but did not respond on voir dire because "as far as [he was] concerned, [his] family [was] [his] wife and [himself]."

In reversing the trial court's denial of defendant's motion, we stated:

> We have analyzed the many decisions regarding the failure of a prospective juror to respond to questions on voir dire regarding his or her family experiences with claims and litigation. This analysis reveals that the courts have almost universally ordered a new trial where the failure to disclose was made with the juror's understanding of the question *and his then present awareness of the prior experience.* Where there exists no reasonable inability to comprehend the information solicited by the question asked of the prospective juror, and *where it develops that the prospective juror actually remembers the experience or that it was of such significance that his purported forgetfulness is unreasonable,* failure to disclose is held to be intentional. (emphasis ours).

*Id.* at 178.

In *Frenette v. Clarkchester Corp.,* 692 S.W.2d 834 (Mo.App.1985) the jury panel was asked: "is there anybody here who has previously had—made a claim where

---

**4.** *Marshall* apparently involved a partial disclosure and a false response during voir dire, not

simply silence on the part of the juror.

you have sought to recover money damages from someone ... as a result of an accident or injury? Anybody have a previous claim, either yourself or your spouse or close relative or friend?" The panel was then asked whether any of them had had a claim filed against them. Two jurors, Peng and Stern, remained silent.

At the hearing on plaintiff's motion for new trial both jurors testified. Peng said he was not aware that a petition seeking $7,641.58 damages plus attorney's fees on a lease default had been filed against him. He admitted that he had received a "demand letter" regarding the default, which he thought about when the voir dire questions were asked, but stated "at that moment, I viewed that as an improper claim or demand and I didn't respond." *Id.* at 835–836. Stern testified that he had forgotten about a suit for personal injuries that he had brought on behalf of his son. That suit had resulted in judgment for plaintiff in the amount of $50,000 against Stern's other son, and Stern had administered the funds of his minor son from 1973 until at least 1975, eight years prior to the *Frenette* trial.

We held that Peng's failure to disclose was intentional because "a prospective juror is not the judge of his own qualifications." *Id.* at 836. As to juror Stern we said:

Stern, on the other hand, stated he did not recall a claim he had previously made on behalf of his son. *Cases in which the trial court was justified in accepting as an excuse that the claim had been forgotten have been affirmed because the claim was insignificant or remote in time.* Stern admitted that he contacted an attorney after the accident involving his sons. He also met with the insurance adjuster and appeared before the court "when they awarded the guardianship [of] the money to be watched over for [Stern's son] for his education." The judgment in Stern's suit was substantial, $50,000. He administered the proceeds for several years until his sons' majority.... *Stern's claim and suit were not insignificant nor too remote in time as not to be considered as an intentional concealment.* (citations omitted) (emphasis ours).

*Id.* at 836–837.

The most recent reported case on the subject is *Stuart v. State Farm Mutual Auto. Ins. Co.,* 699 S.W.2d 450 (Mo.App. 1985). There juror Butkovich failed to reveal a lawsuit involving a 1976 automobile accident in which her husband was injured. Her husband brought suit to recover $4,500 damages, and Ms. Butkovich claimed $500 for loss of consortium. Ms. Butkovich testified at the motion hearing that she had forgotten about the matter.

In affirming the trial court's denial of defendant's motion for new trial the Western District held:

Whether or not Ms. Butkovich had forgotten about the lawsuit was a matter for the court to determine. *The court decided to believe her testimony. Since the record provides a logical basis for that decision, we will not disturb the court's determination.*

The accident from which the suit arose occurred in 1976. Ms. Butkovich's claim was for only $500 for loss of consortium. She was not a passenger in an automobile in the collision, and she testified that her husband filed the suit. She also stated that her husband often went to the doctor and that she was not involved in her husband's affairs. Apparently, nothing has happened in the action because the other driver is missing. The court could reasonably believe that Ms. Butkovich forgot about the matter. (citations omitted) (emphasis ours).

*Id.* at 456–457.

A review of these cases and others reveals a consistent pattern of case-by-case evaluation of the facts. Obviously *Beggs, Marshall,* and *Anderson, supra,* are distinguishable in that the jurors in those cases admitted remembering the non-disclosed incidents at the time of questioning. *Marshall* is also inapplicable to the case at bar because the juror there partially disclosed the prior incident, but affirmatively misrep-

resented crucial facts regarding her insurance claim. Juror Peng in *Frenette, supra,* also admitted recalling the prior incident but failed to disclose that information on voir dire.

Juror Irving did not say that he had forgotten the undisclosed lawsuit, or that he remembered it. His testimony was that he *never knew* about the suit brought by St. Louis Christian Medical Center to recover for services rendered to his wife. Thus none of the previously cited cases deal with the question presented here. We believe that the record provides a logical basis for the trial court's determination that Mr. Irving did not intentionally conceal information. Although there was evidence that he was served with process, he denied that he was, and his testimony was corroborated by his wife. Mrs. Irving, through her position as a school teacher, was the one who held the insurance policy involved in the dispute over the medical bill, and she apparently handled the household finances. Furthermore, his wife hired the attorney, made sure correspondence regarding the claim went to her, and said she made every effort to prevent her husband from discovering the lawsuit. The trial court could reasonably believe that her plan succeeded. We also note that Mrs. Irving's dispute was really with her insurer, not the medical center. We find no abuse of discretion in the trial court's denial of defendants' motion for new trial on the basis of alleged intentional concealment of information by Juror Irving.

Mrs. Ware in this case said she had forgotten the 1974 automobile accident and was unaware that she was a party to any litigation. The credibility of her testimony was likewise a matter for the trial court to determine. *Stuart,* 699 S.W.2d at 456. The accident out of which the allegedly concealed litigation arose occurred *10 years prior* to the trial of this suit. Mrs. Ware never talked to a lawyer about the suit, nor did she employ one. Unlike juror Stern in *Frenette,* who claimed to have forgotten an award of $50,000 recovered on behalf of his minor son and administering those funds

for several years, Mrs. Ware testified that she was unaware of the still pending lawsuit and was not involved in it. We cannot, and do not, find that the trial court abused its discretion in denying defendants' motion for a new trial as it pertained to Mrs. Ware.

Although not part of the motion for new trial, we briefly mention the two other incidents freely disclosed by Mrs. Ware at the motion hearing. The "dog bite" case and her daughter's childhood accident clearly fall within the *Frenette* exception as events that are insignificant or remote in time, and the trial court could reasonably believe that Mrs. Ware had forgotten them. 692 S.W.2d at 836.

While the trial court's judgment could therefore be affirmed within the framework of the above cited cases, the multitude of recent appeals which raise questions regarding concealment of information by jurors compels us to say more on the issue.

The Supreme Court in *Beggs* established that the trial court's judgment in cases such as this should be reversed only "if an appellate court concludes from the record that an abuse of discretion *unmistakably* appears." (emphasis ours). 387 S.W.2d at 504. In *Goodman,* where we found no such abuse of discretion in the trial court's denial of a motion for new trial, Judge Kelly wrote:

> The experienced trial judge here was in an excellent position to observe the venireman-juror's attitude and demeanor and to determine whether she had intentionally concealed the facts so vital to the question of the possibility of her prejudice. He most certainly was in a better position to gauge the prejudicial effect of trial events than we are here on the basis of a cold record.

540 S.W.2d at 911.

We as appellate judges must not lose sight of the clear meaning of the pronouncement of our Supreme Court in *Beggs.* The factual issues, including the question of intent, are for the trial court to

resolve. *See, e.g. Edie v. Coleman*, 235 Mo.App. 1289, 141 S.W.2d 238, 245 (1940); *Lindsey v. P.J. Hamill Transfer Co.*, 404 S.W.2d 397, 399 (Mo.App.1966). In regard to the crucial issue of intent to conceal, the trial court is in a better position to judge the credibility of witnesses, their sincerity, character, and other trial intangibles that are not revealed in the trial record. *Cf.*, *H_____ v. H_____*, 637 S.W.2d 432, 434 (Mo.App.1982).

Furthermore, we should not overlook the trial judge's superior ability to determine the prejudicial effect of a juror's intentional or unintentional failure to disclose information requested during voir dire. While *Beggs* indicates that a juror's bias *may* be inferred from intentional concealment of information, it remains for the trier of fact to determine whether such an inference is warranted.[5] A juror might withhold information for purely personal reasons unrelated to the action being tried, and while such conduct cannot be condoned, neither should it result in a new trial at the expense of an innocent party where the concealment had no prejudicial impact on the proceedings. Defendant's point is denied.

■ Defendants Butsch and Schaefer also posit error in the trial court's granting of plaintiffs' motion in limine regarding Mrs. Schiles' remarriage, contending that her remarriage was "relevant to voir dire examination and cross-examination of Mrs. Schiles about her current work status."

Mrs. Schiles married William Kastien in August 1983 and they reside in Springfield, Illinois. At the time of her marriage to Mr. Kastien, Mrs. Schiles filed a "declaration of legal name" which stated:

I, Yvonne Schiles, hereby declare upon my marriage to William Kastien this 20th day of August, 1983, in Springfield, Illi-

nois, that it is my intention to keep and use as my legal name the name Yvonne Schiles.

The foregoing filed, along with the marriage license of Yvonne Schiles and William Kastien, with the Clerk of the Sangamon County Court, Springfield, Illinois.

It was signed by Yvonne Schiles, William Kastien, and the minister. In addition, Yvonne Schiles has continued to use the name Schiles in contracts, voter registration, financial transactions, and legal proceedings.

Plaintiffs filed a motion in limine to prevent defendants from referring to Yvonne Schiles' remarriage, to Bill Kastien as her husband, or to Kastien as her surname, which the trial court sustained. Defendants were, however, permitted to inquire during voir dire as to whether any members of the jury panel were acquainted with "Bill Kastien of Springfield, Illinois."[6] No affirmative response was received.

Defendants Butsch and Schaefer claim that by granting the motion in limine, the trial court improperly allowed Mrs. Schiles to misrepresent her marital status and name, citing *Glick v. Allstate Ins. Co.*, 435 S.W.2d 17 (Mo.App.1968) and *Duebelbeis v. Dohack*, 615 S.W.2d 488 (Mo.App.1981). We believe this issue was resolved by the Supreme Court in *Johnson v. Pacific Intermountain Exp. Co.*, 662 S.W.2d 237 (Mo. banc 1983), where an apparently identical motion in limine was considered. In affirming the trial court's granting of plaintiff's motion, the court stated:

[Defendants'] point is not well taken. A married woman may take a name which is not that of her current husband. Cases holding that a witness must give her true name, relying on a cautionary

---

5. We should always be mindful of the difference between an inference and a presumption. A "presumption" and an "inference" are not the same thing, a presumption being a deduction which the law requires a trier of facts to make, an inference being a deduction which the trier may or may not make, according to his own conclusions; a presumption is mandatory, an

inference, permissible. *State v. Raeder*, 196 S.W.2d 19 (Mo.App.1946).

6. Defendants sought to further identify Mr. Kastien by referring to his street address. The trial court properly denied this request because it would have indirectly indicated Yvonne Schiles' marriage to Mr. Kastien and the question asked sufficiently identified Mr. Kastien.

instruction to dispel possible prejudice, are not in point because Cathy answered with her true legal name.... The defendants understandably wanted the jury to know about Cathy's remarriage in the hope that they would take this into account in determining damages in spite of any cautionary instructions that might be declaimed. Here no untrue statements were made and the jury was not deprived of any information it had a right to have. No purpose would be served by telling the jurors about the remarriage and then instructing them to disregard the information.

*Id.* at 239.

Although plaintiff in that case did obtain a court order "reaffirming" her name, we find that distinction to be inconsequential. Mrs. Schiles' legal surname was and is Schiles. *See In Matter of Natale,* 527 S.W.2d 402, 404–405 (Mo.App.1975); *Thomas v. Thomas,* 100 Ill.App.3d 1080, 56 Ill. Dec. 604, 605, 427 N.E.2d 1009, 1010 (1981). Thus, here, as in *Johnson,* the trial court properly granted plaintiffs' motion in limine.

We further find that the denial of defendants' proposed uses of evidence regarding Mrs. Schiles' remarriage resulted in no prejudice to them. Defendants were able to sufficiently identify both Mrs. Schiles and Mr. Kastien for purposes of voir dire without mentioning that they were married to each other or resided at the same address. Defendants also sought to cross-examine Mrs. Schiles about her remarriage. Mrs. Schiles testified at trial, without objection, that she was presently employed part-time by a "bookkeeping service" and earned $600 a month. At the hearing on defendants' post-trial motions, Mrs. Schiles testified that full-time employees there doing the same type of work earned $800 a month. Defendants sought to adduce evidence that Mrs. Schiles' present husband, Mr. Kastien, owned the company she worked for. Such testimony would have had no bearing on the merits of the case; nor was it necessary to "dispel the prejudice" created by Mrs. Schiles testi-

mony on direct examination regarding her employment status. Defendants' point is without merit.

■ Defendants also contend that the trial court erred in failing to include St. Joseph's Hospital as a party to whom fault could be allocated on the verdict form. St. Joseph's Hospital was a defendant at trial, but reached a settlement with plaintiffs for $250,000 subsequent to the close of plaintiffs' evidence. The verdict form submitted to the jury provided for the assessment of percentages of fault to the remaining three defendants and decedent. St. Joseph's was not mentioned in any of the verdict directors or the verdict form. The jury returned a unanimous verdict for plaintiffs, found total damages to be $1,500,000, and assessed fault as follows: Dr. Schaefer, 67%; Dr. Butsch, 21%; Ernst Radiology, 10%; and decedent James Schiles 2%.

Defendants' argument is predicated on the Uniform Comparative Fault Act, which is appended to the Supreme Court's opinion in *Gustafson v. Benda,* 661 S.W.2d 11 (Mo. banc 1983). Section 6 of the Uniform Comparative Fault Act provides: "... the claim of the releasing person against the other persons is reduced by the amount of the released person's *equitable share* of the obligation, determined in accordance with the provisions of Section 2." (emphasis ours). *Gustafson,* 661 S.W.2d at 26. Section 2 specifically states that the court shall instruct the jury to make findings indicating "the percentage of the total fault of all of the parties to each claim that is allocated to each · claimant, defendant, third-party defendant, *and person who has been released from liability under Section 6.*" (emphasis ours). *Id.* at 39.

Defendants fail to recognize that the Supreme Court did not specifically adopt the entire Uniform Comparative Fault Act; the Court merely directed that *"insofar as possible* this and future cases shall apply the doctrine of pure comparative fault in accordance with" the uniform act. (emphasis ours). *Id.* at 15.

Section 537.060, RSMo, as amended in 1983, provides in relevant part:

\* \* \* \* \* \*

When an agreement by release, covenant not to sue or not to enforce a judgment is given in good faith to one of two or more persons liable in tort for the same injury or wrongful death, such agreement shall not discharge any of the other tort-feasors for the damage unless the terms of the agreement so provide; however such agreement *shall reduce the claim by the stipulated amount of the agreement,* or in the amount of consideration paid, whichever is greater. *The agreement shall discharge the tort-feasor to whom it is given from all liability for contribution or noncontractual indemnity to any other tort-feasor.* The term "noncontractual indemnity" as used in this section refers to indemnity between joint tort-feasors culpably negligent, having no legal relationship to each other and does not include indemnity which comes about by reason of contract, or by reason of vicarious liability. (emphasis ours).

In footnote 10 of *Gustafson,* the Court stated:

The General Assembly's recent revision of § 537.060, RSMo 1978, prescribing a method of apportioning a judgment against multiple tort-feasors when one defendant has obtained a release, conflicts with the method outlined in § 6 of the Uniform Comparative Fault Act.

\* \* \* \* \* \*

The Uniform Act reduces the amount of the plaintiff's claim against remaining defendants "by the amount of the released person's equitable share of the obligation," rather than by the amount for which the release was obtained. Section 537.060, as amended, is modeled after § 4(a) of the Uniform Contribution Among Tortfeasors Act (1955). *See* 12 Uniform Laws Annotated 63, 98 (1975). The comment appended to § 6 of the Uniform Comparative Fault Act indicates that its drafters chose not to adopt this approach because "it may be unfair to the other defendants and if the goodfaith requirement is conscientiously enforced settlements may be discouraged."

We believe the approach taken in § 6 has the advantage of treating both plaintiffs and defendants equitably while also being logically consistent with the principle of proportionate fault. We doubt that either plaintiffs or defendants want their verdicts to depend on judicial determination of "good faith." Therefore, we respectfully invite the General Assembly to reconsider the language in § 537.060, as amended. *In the meantime, however, insofar as § 6 is inconsistent with § 537.060, we will defer to the terms of the statute.* (emphasis ours).

*Id.* at 15–16. In light of § 537.060, the verdict form submitted in this case was proper. We must reject defendants' contention.

▮▮▮▮ Additionally defendants argue that the trial court miscalculated in assessing judgment against them in that it subtracted the amount of settlement ($250,000) from the total damages prior to calculating and reducing the award by the percentage of fault attributable to decedent. Under defendants' theory, the $1,500,000 total damages should have been reduced by 2% (the fault attributable to decedent), then by the $250,000 settlement, before calculating the judgment against each defendant.

The approach taken by the trial court and that urged by defendants are illustrated below:

| Trial Court | | | Defendants | | |
|---|---|---|---|---|---|
| $1,500,000 | total damages | | $1,500,000 | total damages | |
| — 250,000 | settlement | | — 30,000 | (2% decedent's fault) | |
| | | | — 250,000 | settlement | |
| 1,250,000 | remaining damages | | 1,220,000 | remaining damages | |
| 837,500 | (67%) | Dr. Schaefer | 817,400 | (67%) | |
| 262,500 | (21%) | Dr. Butsch | 256,500 | (21%) | |
| 125,000 | (10%) | Ernst | 122,000 | (10%) | |
| 25,000 | (2%) | Decedent | | | |
| $1,250,000 | 100% | | $1,195,900 | 98% | |

We find that the trial court erred in subtracting the amount of settlement prior to assessing decedent's fault. Plaintiffs concede, and we agree, that neither *Gustafson,* § 537.060, nor the Uniform Comparative Fault Act explicitly answers the question presented here. However, were there no settlement, decedent's fault would have reduced the amount of total damages plaintiffs could recover by 2%, or $30,000. The jury has determined that plaintiffs' total damage is $1,500,000 and that 2% or $30,000 resulted from decedent's negligence. The settlement should not change the amount of damages plaintiffs' can recover, it should only reduce the amount that the non-settling defendants are responsible for. By allowing plaintiffs to recover $1,475,000 instead of $1,470,000, the trial court erroneously awarded plaintiffs more than they would have recovered had there been no settlement. However, it is also clear that defendants' method of proration is incorrect, in that it deducts decedent's fault twice. Under defendants' method, plaintiffs would recover only $1,445,900 instead of $1,470,000.

We believe the proper method of apportioning recovery here is as follows:

| Total Damages | $1,500,000 |
|---|---|
| —2% decedent's fault | 30,000 |
| | $1,470,000 |
| —settlement | 250,000 |
| Remaining damages | $1,220,000 |
| | |
| Dr. Schaefer | |
| [ ($1,220,000 ÷ 98%) × 67%] | $ 834,082 |
| Dr. Butsch | |
| [ ($1,220,000 ÷ 98%) × 21%] | $ 261,428 |
| Ernst | |
| [ ($1,220,000 ÷ 98%) × 10%] | $ 124,490 |
| | $1,220,000 |

By dividing the remaining damages by 100% less decedent's fault (2%) prior to multiplying by the percentage of fault attributable to each defendant, all remaining damages are apportioned. Plaintiffs recover, under this method, $1,220,000 plus the $250,000 settlement, or $1,470,000. However, the trial court's error does not require reversal; under Rule 84.14, we can correct the judgment.

■ Dr. Schaefer also raises two points in regard to closing argument. First he contends that the trial court erred in refusing to permit defense counsel "to argue the present value of plaintiffs' pecuniary loss and that an award of $250,000 could be invested to yield a ten percent tax free return on an annual basis which would be equivalent to what the decedent was earning the year before he died." The proposed argument was described by defense counsel as follows:

My proposal is that I should be allowed—*not mentioning present value,* but to argue to the jury that an award of a certain amount can be invested and can yield a tax—in municipal bonds which are tax free and can yield—return a tax free annual income to the Plaintiff equal to what she would have ... obtained had her husband lived. (emphasis ours).

After counsel argued their positions the court stated:

All right. Here's the ruling. I will not allow the Defendants to argue that the money can be invested in whatever, tax-free bonds or whatever, and there-

fore the income to the Plaintiffs will be the same as if Mr. Schiles was living.

No expert testimony in regard to the proposed argument was introduced at trial. We have carefully examined the record and find no abuse of discretion in the trial court's ruling or prejudice to defendants.

■■■ The second point raised in connection with closing argument is that "the court erred when it permitted plaintiffs' attorney to argue that the decedent's wife and children were not negligent because their negligence was not at issue and ... this argument was confusing to the jury." Again our examination of the record discloses no abuse of discretion by the court or prejudice to defendants.[7] Dr. Schaefer's points regarding closing argument are without merit.

Finally, all defendants contend that the judgment is void because there was no basis for venue in the Circuit Court of the City of St. Louis. There is no question that Dr. Schaefer and Dr. Butsch were residents of St. Louis County, where the alleged acts of negligence occurred; however, under § 508.010(2), RSMo 1978, venue in the City of St. Louis was proper if Ernst Radiology Clinic, Inc. resided there.[8] *See, State ex rel. Parks v. Corcoran,* 625 S.W.2d 686 (Mo.App.1981).

Ernst Radiology Clinic was incorporated in 1969. Its initial registered agent was Walter Braeckel and its registered office was 314 N. Broadway in the City of St. Louis. Mr. Braeckel apparently died in 1978, but no change of registered office or agent was effected prior to the filing of this suit on January 12, 1983.[9]

Section 351.370, RSMo 1978, provides in pertinent part:

Each corporation shall have and continuously maintain in this state:

(1) A registered office which may be, but need not be, the same as its place of business;

(2) A registered agent, which agent may be either an individual, resident in this state, whose business office is identical with such registered office, or a corporation authorized to transact business in this state having a business office identical with such registered office.

Under § 351.375, a corporation may change its registered agent or the address of its registered office by filing a statement with the Secretary of State which contains the required information. Finally, § 351.380 provides in pertinent part:

The registered agent so appointed by a corporation shall be an agent of such corporation upon whom any process, notice, or demand required or permitted by law to be served upon a corporation may be served. In the event that a corporation shall fail to appoint or maintain a registered agent in this state, then the secretary of state as long as such default exists shall be automatically appointed as an agent of such corporation upon whom any process, notice, or demand required or permitted by law to be served upon the corporation may be served ...

■■■ The residence of a corporation for venue purposes is deemed to be in the county where its registered *office* is maintained. *State ex rel. Hails v. Lasky,* 546 S.W.2d 512 (Mo.App.1977). At the time of the filing of this suit and service of process Ernst's registered office was in the City of St. Louis. Thus venue was clearly proper in the City of St. Louis Circuit Court. Defendants' point is without merit.

7. The complained of argument was as follows: First of all, let me talk about a few things which are not a part of this lawsuit. There is no claim nor contention that either Mrs. Schiles nor (sic) her children were in any way to blame or at fault in any respect whatsoever.

8. We note that St. Joseph's Hospital, the released party, also resided in St. Louis County for purposes of venue.

9. Ernst Radiology did file a completed form for the change of registered agent or office with the Secretary of State on February 14, 1983. Its registered office is now located in St. Louis County.

Having previously determined that the court incorrectly computed the amount of damages to be assessed to each party, we hereby correct the judgment by assessing damages against defendants as follows: Dr. Schaefer, $834,082; Dr. Butsch, $261,-428; Ernst Radiology, $124,490. In all other respects the judgment is affirmed. Costs are assessed against defendants.

DOWD, P.J., and CRIST, J., concur.